(Nonrecord No. 780.—

*In re* GEORGE ANASTAPLO, Petitioner.

*Opinion filed November 18, 1959—Rehearing denied Jan. 21, 1960.*

Bristow, Schaefer, and Davis, JJ., dissenting.

George Anastaplo, of Chicago, petitioner, *pro se.*

Harry Kalven, Jr., and Roscoe T. Steffen, both of Chicago, *amici curiae.*

Per Curiam : The present proceeding is a sequel to *In re Anastaplo,* 3 Ill.2d 471. George Anastaplo passed the Illinois bar examination given in August of 1950. Thereafter, following extended hearings before the Committee on Character and Fitness for the First Appellate Court District, the committee, on June 6, 1951, advised Anastaplo that he had failed to prove such qualifications as to character and general fitness as, in the opinion of the committee, would justify his admission to the bar of Illinois.

Anastaplo filed in this court a "Petition and appeal from the refusal of the Committee on Character and Fitness * * * to sign a favorable certificate for admission to the practice of law for the applicant and Motion to the Supreme Court of Illinois to provide for the admission of

the applicant to the practice of law in the state of Illinois." For the reason that Anastaplo charged that the committee abused its discretion and that certain of his constitutional rights were infringed upon, we found that circumstances existed which should cause the matter to be set down for argument and opinion. (*In re Summers*, 325 U.S. 561, 89 L. ed. 1795, 65 S. Ct. 1307.) The matter was taken upon the record of the hearings before the Committee on Character and Fitness, the report of the committee, Anastaplo's brief and oral argument, briefs of two *amici curiae* and the suggestions of a one-time member of the committee in his behalf.

The crux of the earlier controversy centered upon Anastaplo's refusal to answer inquiries as to whether he was a member of the Communist Party or of any subversive organizations in a list compiled by the United States Department of Justice. When initially interrogated as to whether he was a member of the Communist Party Anastaplo answered that the question was an inquiry into his political beliefs and an "illegitimate question." He made like responses to similar questions in other parts of the record. Based upon these refusals, the committee, upon the basis of its opinion that a member of the Communist Party, because of such membership, might not be able in good faith to take the oath of attorney to support the Federal and State constitutions, thereupon directed questions to Anastaplo to elicit his views in what the committee deemed were pertinent areas of inquiry. Questioning of Anastaplo brought out his opinion that a member of the Communist Party, otherwise qualified, should be admitted to the practice of law and that he could see nothing contradictory or incompatible between adherence to tenets of that party and the taking of the attorney's oath to support the constitutions. Anastaplo expressed his belief in the doctrine of revolution and the overthrow of government by force of arms, saying

that he would embrace such doctrine if he could not agree with the existing government, or found it unsatisfactory, and felt that force of arms was the only means to attain the end desired. He also stated that such view would not be altered even though the existing government provided for peaceful and orderly means of change. In its report denying Anastaplo a certificate, the committee stated that the views and opinions expressed by Anastaplo on these matters were not the basis of its decision, but that such views increased the importance of his refusal to answer and made more necessary a complete answer upon the subject of membership in the Communist Party, so that the committee could better determine the ability of Anastaplo to take the oath of attorney in good conscience and his good citizenship.

In his appeal to this court, Anastaplo contended that the committee abused its discretion and exceeded its function by inquiring into what he described as his "political views," directly or indirectly. We rejected this contention. and held that the committee's inquiry into Anastaplo's membership in the Communist Party was relevant to a determination of his good citizenship and his ability to take the oath of a lawyer in good conscience, and that his constitutional rights were not infringed upon. Accordingly, we concluded that "On the present record the petition must be denied." Anastaplo appealed to the United States Supreme Court, which treated the appeal as a petition for writ of *certiorari,* and denied the petition. (*In re Anastaplo,* 348 U.S. 946, 99 L. ed. 740.) The Supreme Court of the United States also denied Anastaplo's motion for admission to the bar of that court in 349 U.S. 903 (1955), 99 L. ed. 1240.

Upon the authority of *Dennis* v. *United States,* 341 U.S. 494, 95 L. ed. 1137, *American Communications Ass'n, C.I.O.* v. *Douds,* 339 U.S. 382, 94 L. ed. 925, and *In re Summers,* 325 U.S. 561, we held that inquiries to applicant

by the committee concerning his membership in the Communist Party did not violate either the first or the fourteenth amendment to the Federal constitution.

On June 25, 1957, subsequent to the decisions of the United States Supreme Court in *Konigsberg* v. *State Bar of California,* 353 U.S. 252, 1 L. ed. 2d 810, 77 S. Ct. 722, *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 1 L. ed. 2d 796, and *Yates* v. *United States,* 354 U.S. 298, 1 L. ed. 2d 1356, 77 S. Ct. 1064, Anastaplo filed with the Committee on Character and Fitness a supplementary petition for rehearing of his application for admission to the bar. On July 2, 1957, the committee denied the petition. Thereafter on September 17, 1957, we entered the following order:

"In 1951 the Committee on Character and Fitness for the First Appellate Court District denied the application of George Anastaplo for admission to the bar of Illinois. This Court affirmed the action of the Committee, (*In re Anastaplo,* 3 Ill. 2d 471,) and the Supreme Court of the United States denied certiorari. (348 U.S. 946.)

"Subsequently the applicant filed with the Committee a petition for rehearing on the basis of certain decisions of the Supreme Court of the United States. The Committee denied this petition.

"The principal question presented by the petition for rehearing concerns the significance of the applicant's views as to the overthrow of government by force in the light of *Konigsberg* v. *State Bar of California,* 353 U.S. 252, and *Yates* v. *United States,* 1 L. ed. 2d 1356, 77 S. Ct. 1064. Additional questions presented concern the applicant's activities since his original application was denied, and his present reputation.

"We are of the opinion that the Committee should have allowed the petition for rehearing and heard evidence on these matters, and the Committee is requested to do so, and to report the evidence and its conclusions."

In obedience to the directions of this court, the committee requested Anastaplo to file the questionnaire required by the committee of all applicants for admission to the bar. Anastaplo's answers, in large measure, supplemented the answers given to the questionnaire filed with the committee on October 26, 1950. Anastaplo also supplied attorney's affidavits and character affidavits from persons acquainted with him. In addition, the committee received communications from various individuals whose names were given as character references by Anastaplo and who furnished information concerning Anastaplo's moral character and general fitness to practice as an attorney.

The committee conducted five extended hearings, commencing February 28, 1958, and ending May 19, 1958. Anastaplo testified and argued at great length, as evidenced by approximately 420 pages of the record covering his oral testimony and argument. The record also contains law review articles, newspaper reprints, other exhibits, and letters from Anastaplo addressed to the committee. During the progress of the hearings, the committee repeatedly advised Anastaplo that he enjoyed the right to be represented by counsel and to call witnesses. He elected to submit his application solely upon his own testimony and argument.

During the interval between denial of his original application and the submission of his second application, Anastaplo had been employed the greater part of the time as an instructor and research assistant at the University of Chicago. The character affidavits and letters of reference supplied by Anastaplo disclose that he is well regarded by his academic associates, by professors who taught him in school and by lawyers who are personally acquainted with him. The committee says that it has not been supplied with any information by any third party which is derogatory to Anastaplo's character or general reputation, and that it has received no information from any outside source which would cast any doubt on Anastaplo's loyalty or which

would tend to connect him in any manner with any subversive group. The committee further advises us that it has conducted no independent investigation into Anastaplo's character, reputation or activities. For the very practical reason that the committee has no personnel or other resources for any such investigation, the committee states that it has traditionally asserted the view that it cannot be expected to carry the burden of establishing, by independent investigation, whether an applicant possesses the requisite character and fitness for admission to the bar and that a duty devolves upon the applicant to establish that he possesses the necessary qualifications and that it is then the duty of the committee to test, by hearings and questioning of the applicant, the worth of the evidence which he proffers. We agree, and have held that the discretion exercised by the Committee on Character and Fitness will not ordinarily be reviewed. *In re Frank,* 293 Ill. 263.

The committee conducted an extensive inquiry into Anastaplo's belief in the right to overthrow the government by force and violence. His testimony in this regard does not require narration since a majority of the committee concluded that while the views expressed by Anastaplo, while strongly libertarian and expressed with an intensity and fervor not necessarily shared by all good citizens, are not inconsistent with those held by many patriotic Americans both at the present time and throughout the course of this country's history and do not in and of themselves reveal any adherence to subversive doctrines. Accordingly, the committee quite properly decided that although, in the light of the foregoing conclusion, there was no need to consider in this connection either *Yates* v. *United States,* 354 U.S. 298, or *Konigsberg* v. *State Bar of California,* 353 U.S. 252, the *Konigsberg case* necessarily required consideration, with respect to the committee's authority to ask Anastaplo questions concerning Communist or other subversive affiliations and activities.

The committee regarded Anastaplo's views bearing upon his attitude toward established authority and orderly governmental procedures as relevant to an inquiry into his character and fitness for admission to the bar. First, Anastaplo declined to deny that circumstances might exist under which he would resist by force Federal or State officers seeking to enforce judgments or decrees in proceedings against him personally which had become final after full review by the highest court having jurisdiction. Anastaplo testified: "I would not care to say there might not be instances where resistance to an officer of the law executing such a mandate might not be improper." He testified, further, that if admitted to practice and advising a client, he would not advise the client to resist by force or other similar means a final judgment or decree against the client, because, in his opinion, it was his duty to advise the client only "with respect to the legal system as it exists. In so far as I am a lawyer, I can tell him what his rights are under the accepted law * * * under the Canons of Ethics I would be derelict in my duty if I presume to do much more than that." Although disclaiming that he was arrogating to himself rights or privileges which he would deny to others as "citizens," he testified that "If, however, he [the client] were thereupon to approach me on some other basis, not as an attorney, there may be other advice I would be willing to give him." Anastaplo asserted that he saw no inconsistency between such an opinion and the taking of an oath to support the Federal and State constitutions "without any reservations whatsoever."

The foregoing views, according to the committee's report, raise a serious question whether the attitude expressed by Anastaplo toward final court determinations binding upon himself and toward attempts to enforce them conformably to the law is consistent with the oath required of attorneys in this State. An attorney is an officer of the courts. (*In re Day,* 181 Ill. 73.) In *Cooper* v. *Aaron,* 358

U.S. 1, 3 L. ed. 2d 5, the United States Supreme Court said, at page 8: "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it."

The committee's report also suggests that Anastaplo's attitude with respect to advising others along the same subversive lines in his capacity as "citizen" in contradistinction to his capacity as "attorney" raises additional serious questions concerning his capacity to take the oath required of attorneys in this State. See: *In re Anastaplo*, 3 Ill.2d 471, at page 479.

The major issue presented to the committee arose from the applicant's continued refusal to answer questions regarding possible Communist or other subversive affiliations. In our first opinion in this case, we said in 3 Ill.2d 471, at page 478:

"Neither the committee nor this court, faced with the question of whether membership in the Communist Party is relevant to a determination of petitioner's good citizenship and his ability to take the oath of lawyer in good conscience, need be oblivious to the existence of that party and its established conspiratorial nature, nor to the view in which it is held by the people of this country. Aside from the fact that membership in an organization advocating the forceful overthrow of our government would give rise to questions concerning the sincerity of an applicant's oath of loyalty, it is proper to consider that the lawyer, as an officer of the court, holds a position of public trust, or at least of semipublic trust. * * * While technically not a governmental employee, a lawyer meets on common ground with one so employed, in that loyalty to the constitution is an inalienable condition to their service. In either case, Communist Party membership or communist activity is totally incompatible with such loyalty.

"It is our opinion, therefore, that a member of the Communist Party may, because of such membership, be unable

truthfully and in good conscience to take the oath required as a condition for admission to practice, and we hold that it is relevant to inquire of an applicant as to his membership in that party. A negative answer to the question, if accepted as true, would end the inquiry on the point. If the truthfulness of a negative answer were doubted, further questions and information to test the veracity of the applicant would be proper. If an affirmative answer were received, further inquiry into the applicant's innocence or knowledge as to the subversive nature of the organization would be relevant. Under any hypothesis, therefore, questions as to membership in the Communist Party or known subversive 'front' organizations were relevant to the inquiry into petitioner's fitness for admission to the bar. His refusal to answer has prevented the committee from inquiring fully into his general fitness and good citizenship and justifies their refusal to issue a certificate."

We reaffirm our adherence to the foregoing views.

In *Orloff* v. *Willoughby,* 345 U.S. 83 (1953), 97 L. ed. 842, the petitioner, who had been inducted under the Doctor's Draft Act, brought *habeas corpus* proceedings for his discharge from Army because he had not been assigned to the specialized duties nor given the commissioned rank to which he claimed to be entitled by the circumstances of his induction. The petitioner had refused to answer the question "Are you now or have you ever been a member of the Communist Party, U.S.A., or any Communist Organization?" in connection with his application for a commission. In affirming the denial of the writ, the Supreme Court (Justice Jackson) said at page 91: "Could this Court, whatever power it might have in the matter, rationally hold that the President must, or even ought to, issue the certificate to one who will not answer whether he is a member of the Communist Party? It is argued that Orloff is being punished for having claimed a privilege which the Constitution guarantees. No one, at least no one on this Court

which has repeatedly sustained assertion by Communists of the privilege against self-incrimination, questions or doubts Orloff's right to withhold facts about himself on this ground. No one believes he can be punished for doing so. But the question is whether he can at the same time take the position that to tell the truth about himself might incriminate him and that even so the President must appoint him to a post of honor and trust. We have no hesitation in answering that question "No."

In *Lerner* v. *Casey*, 357 U.S. 468 (1958), 2 L. ed. 2d 1423, petitioner, a subway conductor in the New York City Transit System, was discharged by his employer under the New York Security Risk Law on the ground that his refusal, based upon the privilege against self incrimination guaranteed by the fifth amendment, to answer a question of his employer as to his membership in the Communist Party, showed that he was of doubtful trust and reliability. Petitioner sued in the New York State court for reinstatement, attacking his discharge on various grounds, including lack of due process. The New York supreme court dismissed the suit and the Appellate Division and Court of Appeals both affirmed. On *certiorari,* the United States Supreme Court also affirmed. Justice Harlan for the majority said, at pages 476-8:

"In other words, we read the court's opinion as meaning that a finding of doubtful trust and reliability could justifiably be based on appellant's lack of frankness, *cf. Garner* v. *Board of Public Works,* 341 U.S. 716; *Beilan* v. *Board of Public Education, ante,* p. 399, decided today, just as if he had refused to give any other information about himself which might be relevant to his employment. It was this lack of candor which provided the evidence of appellant's doubtful trust and reliability which under the New York statutory scheme constituted him a security risk. The Court of Appeals went on to reason that had appellant refused, without more, to answer the question, the finding

of 'doubtful trust and reliability' would have undoubtedly been permissible, and that the basis for such a finding, in appellant's refusal to answer, was not destroyed by the claim of the Fifth Amendment privilege because the Commissioner was not required to accept that claim as an adequate explanation of the refusal.

"Accepting, as we do, these premises of the state court's opinion, we find no constitutional block to its decision sustaining appellant's dismissal from employment * * *. Nor, as the Court of Appeals stressed, was the claim of possible self-incrimination made the basis for an inference that appellant was a Communist and therefore unreliable. Hence we are not faced here with the question whether party membership may rationally be inferred from a refusal to answer a question directed to present membership where the refusal rests on the belief that an answer might incriminate, *cf. Adamson v. California,* 332 U.S. 46, or with the question whether membership in the Communist Party which might be 'innocent' can be relied upon as a ground for denial of state employment. *Cf. Wieman v. Updegraff, supra; Konigsberg v. State Bar of California,* 353 U.S. 252; *Schware v. Board of Bar Examiners,* 353 U.S. 232.

"We think it scarcely debatable that had there been no claim of Fifth Amendment privilege, New York would have been constitutionally entitled to conclude from appellant's refusal to answer what must be conceded to have been a question relevant to the purposes of the statute and his employment, *cf. Garner v. Board of Public Works, supra,* that he was of doubtful trust and reliability. Such a conclusion is not 'so strained as not to have a reasonable relation to the circumstances of life as we know them.' *Tot v. United States,* 319 U.S. 463, 468. This Court pointed out in *Garner* that a government employee can be required upon pain of dismissal to respond to inquiry probing into matters relevant to his employment, and that present membership in the Communist Party is such a matter.

See also *Beilan* v. *Board of Public Education, supra.* Certainly it is not a controlling constitutional distinction that New York, rather than impose on employees, as in *Garner* and *Beilan,* an absolute duty to respond to permissible inquiry upon threat of dismissal for refusal, has in these proceedings held that an employee lacking in candor to his governmental employer evidences doubt as to his trust and reliability. Finally, unlike the situation involved in *Konigsberg* v. *State Bar of California, supra,* there is here no problem of inadequate notice as to the consequences of refusal to answer, for appellant was specifically notified that continued refusal might lead to his dismissal."

In *Beilan* v. *Board of Public Education,* 357 U.S. 399, 2 L. ed. 2d 1414, petitioner, a public school teacher, was discharged by the local school board for "incompetency" under the Pennsylvania School Code because of his refusal, continued after warning that failure to answer might lead to dismissal, to answer a question of his superintendent as to his membership in a Communist political association. On an administrative appeal, the superintendent sustained the local board, but the county court set aside the discharge. On the appeal by the board the Pennsylvania Supreme Court reversed and reinstated the discharge. On *certiorari,* the United States Supreme Court affirmed. It held that due process was not violated by petitioner's discharge on the ground of "incompetency" evidenced by petitioner's refusal to answer the request of the superintendent for information as to the teacher's loyalty and as to his activities in certain subversive organizations, such refusal being based upon the fifth amendment and other constitutional objections.

Justice Burton, who had voted with the majority in the *Konigsberg case,* said, at pages 404-6, 408-9: "The only question before us is whether the Federal Constitution prohibits petitioner's discharge for statutory 'incompetency' based on his refusal to answer the Superintendent's questions.

"By engaging in teaching in the public schools, petitioner did not give up his right to freedom of belief, speech or association. He did, however, undertake obligations of frankness, candor and cooperation in answering inquiries made of him by his employing Board examining into his fitness to serve it as a public school teacher.

\* \* \*

"The question asked of petitioner by his Superintendent was relevant to the issue of petitioner's fitness and suitability to serve as a teacher. \* \* \* He made it clear that he would not answer any question of the same type as the one asked. Petitioner blocked from the beginning any inquiry into his Communist activities, however relevant to his present loyalty. The Board based its dismissal upon petitioner's refusal to answer any inquiry about his relevant activities—not upon those activities themselves. It took care to charge petitioner with incompetency, and not with disloyalty. It found him insubordinate and lacking in frandkness and candor—it made no finding as to his loyalty.

\* \* \*

"In the instant case, the Pennsylvania Supreme Court has held that 'incompetency' includes petitioner's 'deliberate and insubordinate refusal to answer the questions of his administrative superior in a vitally important matter pertaining to his fitness.' 386 Pa. at 91, 125 A.2d at 331. This interpretation is not inconsistent with the Federal Constitution.

\* \* \*

"Our recent decisions in *Slochower* v. *Board of Higher Education,* 350 U.S. 551, and *Konigsberg* v. *State Bar of California,* 353 U.S. 252, are distinguishable. \* \* \*

"In the *Konigsberg case, supra,* at 259-261, this Court stressed the fact that the action of the State was not based on the mere refusal to answer relevant questions—rather, it was based on inferences impermissibly drawn from the refusal. In the instant case, no inferences at all were drawn

from petitioner's refusal to answer. The Pennsylvania Supreme Court merely equated refusal to answer the employing Board's relevant questions with statutory 'incompetency.' "

In the instant case, as in *Lerner* and *Beilan,* and unlike the situation in *Konigsberg,* no problem exists as to inadequate notice of the consequences of a refusal to answer; the applicant was specifically notified both by the Illinois Supreme Court in its opinion in 3 Ill.2d 471, and by the committee on rehearing that his continued refusal to answer might lead to the denial of his application.

In *Barenblatt* v. *United States,* 3 L. ed. 2d 1115, 79 S. Ct. 1081 (1959), the petitioner was convicted of contempt by the district court for refusal to answer certain questions before a subcommittee of the Committee on Un-American Activities of the House of Representatives. Two of the questions were "Are you now a member of the Communist Party?" and "Have you ever been a member of the Communist Party?" The Court of Appeals affirmed but the Supreme Court vacated the judgment and remanded the case to the Court of Appeals for reconsideration in light of *Watkins* v. *United States,* 354 U.S. 178 (1957), 1 L. ed. 2d 1273. The Court of Appeals reaffirmed the conviction and the Supreme Court affirmed. Justice Harlan said at pages 1129-1131 (L. ed.) :

"That Congress has wide power to legislate in the field of Communist activity in this Country, and to conduct appropriate investigations in aid thereof, is hardly debatable. The existence of such power has never been questioned by this Court, and it is sufficient to say, without particularization, that Congress has enacted or considered in this field a wide range of legislative measures, not a few of which have stemmed from recommendations of the very Committee whose actions have been drawn in question here. In the last analysis this power rests on the right of self-preservation, 'the ultimate value of any society,' Dennis v.

United States, 341 U.S. 494, 95 L. ed. 1137. Justification for its exercise in turn rests on the long and widely accepted view that the tenets of the Communist Party include the ultimate overthrow of the Government of the United States by force and violence, a view which has been given formal expression by the Congress.

"On these premises, this Court in its constitutional adjudications has consistently refused to view the Communist Party as an ordinary political party, and has upheld federal legislation aimed at the Communist problem which in a different context would certainly have raised constitutional issues of the gravest character. See, e.g., Carlson v. Landon, 342 U.S. 523, 96 L. ed. 547, 72 S. Ct. 525; Galvan v. Press, 347 U.S. 522, 98 L. ed. 911, 74 S. Ct. 737. On the same premises this Court has upheld under the Fourteenth Amendment state legislation requiring those occupying or seeking public office to disclaim knowing membership in any organization advocating overthrow of the Government by force and violence, which legislation none can avoid seeing was aimed at membership in the Communist Party. See Gerende v. Board of Supervisors of Elections, 341 U.S. 56, 95 L. ed. 745, 71 S. Ct. 565; Garner v. Board of Public Works, 341 U.S. 716, 95 L. ed. 1317, 71 S. Ct. 909. See also Beilan v. Board of Public Education, 357 U.S. 399, 2 L. ed. 2d 1414, 78 S. Ct. 1317; Lerner v. Casey, 357 U.S. 468, 2 L. ed. 2d 1423, 78 S. Ct. 1311; Adler v. Board of Education, 342 U.S. 485, 96 L. ed. 517, 72 S. Ct. 380. Similarly, in other areas, this Court has recognized the close nexus between the Communist Party and violent overthrow of government. See Dennis v. United States, supra; American Communication Ass'n, C.I.O. v. Douds, supra. To suggest that because the Communist Party may also sponsor peaceable political reforms the constitutional issues before us should now be judged as if that Party were just an ordinary political party from the standpoint of national security, is to ask this Court to blind itself

to world affairs which have determined the whole course of our national policy since the close of World War II, affairs to which Judge Learned Hand gave vivid expression in his opinion in United States v. Dennis, (2d Cir.) 183 F.2d 201, 213, and to the vast burdens which these conditions have entailed for the entire Nation.

\* \* \*

"\* \* \* An investigation of advocacy of or preparation for overthrow certainly embraces the right to identify a.witness as a member of the Communist Party, see Barsky v. United States, 83 App. D.C. 127, 167 F.2d 241, and to inquire into the various manifestations of the Party's tenets. The strict requirements of a prosecution under the Smith Act, see Dennis v. United States, supra, and Yates v. United States, 354 U.S. 298, 1 L. ed.2d 1356, 77 S. Ct. 1064, are not the measure of the permissible scope of a congressional investigation into 'overthrow,' for of necessity the investigatory process must proceed step by step."

In *Uphaus* v. *Wyman*, 3 L. ed. 2d 1090, 79 S. Ct. 1040 (1959), the appellant, the executive director of World Fellowship, Inc., was adjudged in contempt by a New Hampshire county court for refusal to produce in connection with a State subversive inquiry a list of the guests attending the organization's summer camp. The New Hampshire Supreme Court affirmed the judgment and the Supreme Court of the United States also affirmed. Justice Clark said at pages 1096-1098 (L. ed.) : "The interest of the guests at World Fellowship in their associational privacy having been asserted, we have for decision the federal question of whether the public interests overbalance these conflicting privates ones. Whether there was 'justification' for the production order turns on the 'substantiality' of New Hampshire's interest in obtaining the identity of the guests when weighed against the individual interests which the appellant asserts. National Association for Advancement of Colored People v. State of Alabama, 357 U.S. 449

(1958). * * * The Attorney General sought to learn if subversive persons were in the State because of the legislative determination that such persons, statutorily defined with a view toward the Communist Party, posed a serious threat to the security of the State. The investigation was, therefore, undertaken in the interest of self-preservation, 'the ultimate value of any society,' Dennis v. United States, (1951), 341 U.S. 494, 509, 95 L. ed. 1137, 71 S. Ct. 857. This governmental interest outweighs individual rights in an associational privacy which, however real in other circumstances, cf. National Association for Advancement of Colored People v. State of Alabama, supra, were here tenuous at best."

In our earlier opinion, (3 Ill.2d 471,) we said at page 482: "Further, in regard to the contention that petitioner's right of free speech has been infringed upon by the inquiries of the committee, we may also consider the established principle of this jurisdiction that the practice of law is a privilege, not a right. In granting that privilege we may impose any reasonable conditions within our control and if an applicant does not choose to abide by such conditions he is free to retain his beliefs and go elsewhere. Among other things, the granting of the privilege to practice law in this State is conditioned upon proof by the applicant of his good moral character, of his general fitness to practice law and of his good citizenship, and upon the taking of an oath to support the State and Federal constitutions. Such conditions are almost universal in this land and, so far as we can ascertain, their reasonableness has never been attacked. When an applicant, knowing of such conditions, applies for admission and signifies that he will take the oath of lawyer, we think it inconsistent with the privilege he seeks that he should be permitted to defeat pertinent inquiry into his ability to fulfill such conditions by any claim of the right of free speech."

In the case of *In re Isserman,* 345 U.S. 286 (1953),

97 L. ed. 1013, the respondent was one of the attorneys for the defendants whose convictions were affirmed in *Dennis* v. *United States,* 341 U.S. 494 (1951). At the conclusion of the trial he was convicted for contempt of court, which was affirmed in *Sacher* v. *United States,* 343 U.S. 1 (1952). The Supreme Court of New Jersey disbarred the respondent, and the Supreme Court of the United States then issued a rule for the respondent to show good cause why he should not be disbarred in that court. In disbarring the respondent, the Supreme Court (Chief Justice Vinson) said at page 289: "Our rule puts the burden upon respondent to show good cause why he should not be disbarred. * * * There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice. That to the individual disbarred there is a loss of status is incidental to the purpose of the Court and cannot deter the Court from its duty to strike from its rolls one who has engaged in conduct inconsistent with the standard expected of officers of the Court."

The Committee on Character and Fitness drew no inference of disloyalty or subversion from Anastaplo's consistent refusals to answer questions concerning Communist or other subversive affiliations. We agree with the committee that a strong public interest supports the interrogation of applicants for admission to the bar on their adherence to our basic institutions and form of government and that this public interest in the character of its attorneys overrides an applicant's purely personal interest in keeping such views to himself. In the light of *Barenblatt* v. *United States,* 3 L. ed. 2d 1115, 79 S. Ct. 1081, alone, the relevancy of an inquiry as to whether an applicant for admission to the bar is a member of the Communist Party is no longer debatable. Decisions of the United States Supreme Court since *In re Anastaplo,* 3 Ill.2d 471, fortify our earlier conclusion

that a determination as to whether an applicant can in good conscience take the attorney's oath to support and defend the constitutions of the United States and the State of Illinois is impossible where he refuses to state whether he is a member of a group dedicated to the overthrow of the government of the United States by force and violence. By failing to respond to the higher public interest, Anastaplo obstructed the proper functions of the Committee on Character and Fitness. By virtue of his own recalcitrance he failed to demonstrate the good moral character and general fitness to practice law necessary for admission to the bar of this State.

The report of the Committee on Character and Fitness is confirmed.

*Report confirmed.*

Mr. JUSTICE BRISTOW, dissenting:

I must dissent from the majority opinion on the ground that it deprives the applicant of due process of law under the Federal constitution by denying him admission to the bar in the absence of a scintilla of derogatory evidence to mar the substantial record of his good moral character, and is in direct conflict with the decisions of the United States Supreme Court in *Konigsberg* v. *State Bar of California,* 353 U.S. 252, 1 L. ed. 2d 810, and *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 1 L. ed. 2d 796.

The constitutional issue in this cause is not, as the *per curiam* opinion implies, whether the committee's questions on political or subversive affiliation were constitutional. The issue is rather, even if Anastaplo were wrong about the impropriety of such questions, whether his good-faith refusal to answer them, on the ground that the first and fourteenth amendments of the Federal constitution barred such inquiry, is a sufficient basis for denying him admission to the bar for failure to establish good moral character. That issue has been determined by the United States Su-

preme Court in the *Konigsberg case,* which the majority opinion refuses to follow.

Before considering that case or the authorities cited in the majority opinion, I must point out that while I am no less sensitive to the very real danger of Communist infiltration in the bar than is the *per curiam* opinion, I do not believe, as the majority opinion does, that an indictment of the Communist Party, however justified, or a reiteration of the lawyer's obligation to his country, or a warning that the nation must have power to protect itself, however appropriate, is any substitute for evidence against George Anastaplo's moral character. Moreover, I am constrained to call attention to the distorted picture of applicant, which the *per curiam* opinion endeavors to create.

The opinion at the outset tries to create the taint that applicant believes in a subversive political philosophy by quoting isolated statements out of context from the 1951 record—which is not even before this court—and by completely omitting applicant's statements respecting the right to revolution in the present record. The opinion omits applicant's statement that his views on the right to revolution are, and have been, the same as those embodied in the Declaration of Independence and advanced by Lincoln and Daniel Webster in writings set forth in the present record. Nor does the opinion refer to applicant's unequivocal statement in the record: "But as I said when I first appeared before the full committee on January 5, 1951, I do not think anyone would be justified at a time such as this, when the normal processes of government permit reasonable and peaceful change, to participate in action leading to the overthrow of the government. The Committee must realize that I would be no less reluctant than they to see the right of revolution exercised, except in most extreme circumstances. I trust that my position and what I have contributed to its defense indicates an abiding commitment to constitutional government."

Instead, the opinion dismisses such testimony summarily with the statement that applicant's views do not now require narration because the committee did not find them objectionable, after leaving the taint from the isolated statements in the prior record.

The *per curiam* opinion clutches at straws by even referring to Anastaplo's views on resistance to a court decree as grounds for denying him admission to the bar, in view of his unequivocal statement that he would resist a court decree only under circumstances where constitutional government has been subverted, so that resistance would really be aimed at restoring the constitution and supporting it without reservation. Surely this is no war against the constitution, as the *per curiam* opinion implies. Even the minority report of the committee frankly regarded this matter of resistance to a court decree as a far fetched ground for excluding applicant, particularly in view of his own exemplary conduct during the course of his bar admission litigation these past 9 years, which is the best evidence of his reaction to court orders.

I could not, within the confines of this dissenting opinion, summarize the hours of questions, answers and arguments revealing all of applicant's views. I have already alluded to some of them. However, since the majority opinion has sought to give a distorted picture of those views and of the nature of the proceedings, I wish to call attention to some of the questions and answers which cast light on this matter.

At the very first session, applicant was asked whether he was a member of any nationality organization. After he replied that he was not, he was asked whether he was a member of a nationality organization that had been designated by the Attorney General as subversive. Applicant refused to answer, explaining that when the question designated the organization as subversive, its intent was to elicit information about political affiliations. To such inquiry he must object on the ground that it infringed his rights

under the first and fourteenth amendments, was beyond the province of a Character and Fitness Committee, and, more particularly, was outside of the terms of the Supreme Court rehearing order of 1957. He pointed out that if the committee was interested in eliciting information, it already had the answer to this question, since he had just stated that he was not a member of *any* nationality organization.

In response to the query, "Are you refusing for fear that if you did answer one way or another we might be able to check and find that you have committed perjury," applicant stated, "That is not my fear." He added, "With reference to perjury, it is irrelevant to this situation as is any reference to the Fifth Amendment."

He explained that he would refuse to answer on constitutional principles all questions relating to political affiliations, including those with the Democratic and Republican parties, as well as with any and all organizations on the Attorney General's list, including the Communist Party, the K.K.K., or the Silver Shirts of America, even if the answers reflected favorably on him. He stated: "I would rather be rejected by this Committee if this question becomes crucial by taking a firm position on constitutional principles, than be accepted by seeming to take it, and at the same time taking a back door."

Applicant added the observation that the committee, in pursuing this line of inquiry, was asking questions the answers to which it had very little doubt about. In support of that assertion he referred to a statement in a document identified under oath as accurate, apparently reporting the admission of a Justice of this court, that at the last hearing "no one of the committee or the court ever though that he [Anastaplo] was a Communist." Applicant also reiterated that the committee had nothing in the record originally, or during the course of the intervening 7 or 8 years, to justify this line of inquiry or to indicate that he would not take his oath seriously and in good faith. In this connection, a

spokesman for the committee admitted: "No one has stated to this committee that you are or have ever been a Communist, or a member of the Ku Klux Klan, or a member of the organiaztions listed as subversive on the Attorney General's list."

Consequently, applicant moved that the committee desist from this line of inquiry, which was beyond the Supreme Court mandate, was neither relevant, nor for the alleged purpose of inquiring into areas it might otherwise be uncertain about, was being pursued only to induce him to assert his constitutional objections, and was thereby highly prejudicial. The committee denied his motion.

In response to the admonition by the committee that his refusal to answer the question whether he was a member of the Communist Party "may have serious consequences," Anastaplo replied, "Am I ineligible because I take the dissents of certain members of the Supreme Court seriously?" He then pointed out that in the *Konigsberg* and *Schware* cases (353 U.S. 252; 353 U.S. 232) even the majority of the court supported his interpretation of the law, whereby refusal to answer the questions on the grounds asserted by him would, at most, constitute merely one piece of evidence in the record. He argued that such refusal would not necessarily be adverse nor warrant rejection. His position is best stated in his letter to the committee on March 27, 1958, which is included in the record:

"Is one not obliged in the interest of good advocacy and judicial integrity to resist strenuously, even at the risk of incurring official displeasure, unconstitutional disregard of the rule of law? May not, in fact, such resistance reflect the best traditions of the bar, and thereby provide the best evidence that a character committee can desire with respect to applicant's qualification for the practice of law?"

This precise point, that refusal to answer may be indicative of good character, is evident in this record. Applicant courageously and properly refused to answer the unconstitutional religious inquiries—*i.e.,* whether he believed in

a Diety, or eternal punishment as a sanction for his oath. He stated that he would respect his duties as an attorney, with or without the oath, but did not care to speak about whether there were any religious sanctions, such as the fear of eternal punishment, back of his oath, or whether he believed in a Diety, on the grounds that the constitution barred such inquiries. This line of inquiry, persisted in since the very first session, and apparently based upon an 1856 decision, was later admitted by the committee to be improper and unconstitutional since 1870.

The *per curiam* opinion completely overlooked this portion of the record. I cannot follow that course, particularly since the record shows that applicant's refusal to answer these religious questions had so prejudiced the committee that one member stated that the refusal to answer had a "substantial bearing on his [applicant's] fitness to practice law." Such prejudice could hardly be wiped out by the statement of the chairman that these improper questions would not be taken into consideration.

The majority opinion also ignored applicant's argument in support of his refusal to answer the political affiliations questions, that the avowed Communist of the type the committee would want to ferret out of the profession as a menace to our government would have little difficulty in compromising constitutional principles and in giving the desired answers, and that the approach of the committee was effective only in discouraging applicants to stand by principles. I find merit in this argument.

The majority opinion makes no reference to applicant's closing arguments, which I find indicative of his views on our form of government, and the obligation of the lawyer to that government. Here, the applicant first reviewed this cause from its inception, pointing out that the original committee action in 1951 reflected the tenor of the times, when groups tried to outdo each other in hunting possible subversives, and explaining that the Illinois Supreme Court

was misled into sustaining the committee's action by the suppression and distortion of the sequence of evidence. He reiterated the lack of foundation for the affiliation inquiries, the legal arguments supporting his position, with particular emphasis on the *Konigsberg* record and decision. Finally, he emphasized the basic tenets of our republican government and the obligations of the bar to preserve them, and to lead the nation by precept and example.

In addition to these significant omissions in the *per curiam* opinion, which give a completely misleading impression of the applicant and the hearings, I must also take issue with the scant attention paid by the *per curiam* opinion to the character affidavits and letters of reference submitted to the committee. In my opinion the court should have given considerable weight to these affidavits, as did the United States Supreme Court in the *Schware* and *Konigsberg cases* (353 U.S. 232, 244, 1 L. ed 2d 796; 353 U.S. 252, 265, 1 L. ed 2d 810), particularly since they were submitted at the committee's request, on their forms, and were presented by persons of stature in the legal profession and other fields, who do not bandy about tributes such as were paid to applicant's honesty, integrity, general conduct and character traits qualifying him for the practice of law.

The affiants included Professor Alexander Meiklejohn, Professor Emeritus of the University of Wisconsin and past president of Amherst College, in whose name the American Association of University Professors established an Annual Award; Professor Malcolm Sharp, professor of law at the University of Chicago; Professor Roscoe Steffen, professor of law at Yale University and the University of Chicago, and advocate for the Department of Justice before the United States Supreme Court; Professor Yves Simon, formerly of Notre Dame and currently professor of philosophy at the University of Chicago, and recipient of the Spellman-Aquinas Medal for excellence in philosophy

from the American Catholic Philosophical Association; Richard Weaver of the University of Chicago faculty and editorial writer for Modern Age, a conservative review. Other affiants include a former chairman of the Character and Fitness Committee; a lawyer who authored a text on the canons of ethics, and contributed substantially to bar association work; a minister, the Dean of University College, and others who supervised Anastaplo's work. These affiants praised applicant's character unstintingly. We note some of the comments, which are representative of the tenor of the affidavits.

Professor Meiklejohn attested: "He [Anastaplo] is intellectually able, a hard, thorough student and moved by high devotion to the principles of freedom and justice * * * unqualifiedly worthy of the highest trust and confidence."

Professor Sharp attested: "His [Anastaplo's] reputation in these respects [for honesty, integrity and general conduct] is of the highest. No question has ever been raised about his honesty or his integrity, and his general conduct, characterized by friendliness, quiet independence, industry and courage, is reflected in his reputation * * *. His fellow students respect him. He is in every way among the very best of the students I have seen in my teaching experience."

Richard Weaver attested to applicant's unusual intelligence, fairness and personal modesty, and patriotism in the old-fashioned sense, as well as his sympathetic understanding of affiant's conservatism. "Everything I know about applicant leaves me feeling that he is an unusually intelligent, balanced and helpful American citizen."

Professor Yves Simon characterized Anastaplo by "intelligence, conscientiousness, sincerity and integrity," and concluded, "I consider Anastaplo to be a young man of the most distinguished and lofty moral character."

Dean Donohue of University College, where Anastaplo taught, refers to his honesty as "admirable and unequivo-

cal," and to his integrity as "perhaps even over rigid for our culture."

Robert Coughlan, Anastaplo's supervisor at the Industrial Relations Center, attested: "I would recommend him without the slightest reservation for any position involving the highest and most sacred trust. If admitted to the American Bar, he could do nothing that would not reflect glory on that institution."

Attorney William Trumbull attested: "Affiant has found applicant to exhibit in all respects an exceptionally high degree of honor and integrity and profound loyalty to his country, its form of government and its ideals and to enjoy an excellent reputation for good moral character."

In addition to this evidence, I believe that a review of the career of George Anastaplo will also cast light upon his character and fitness.

This record shows that George Anastaplo was born in 1925, in St. Louis, Missouri, where he secured his elementary school education; that the family moved to Carterville, Illinois, where he attended high school; and that he attended the University of Illinois for some three months before enlisting in the Air Corps, where he attained the rank of Second Lieutenant, and served some 38 months in the Pacific, European and North African theatres of war. He came out of service in February, 1947, and was attached to the Inactive Reserves until his resignation some few years ago. He was accepted by the University of Chicago for the Fall Term of 1947, and during 6 of the intervening months he attended Southern Illinois University. He secured an A.B. degree from the University of Chicago one year later, after carrying a double schedule of classes, and then attended law school. He passed the bar examination in the fall of 1950, and was graduated from law school in 1951.

After this court denied his application for admission to the bar, he, his wife, whom he married in 1949, and their child had a brief trip to Paris, where he enrolled at

the Sorbonne. From there they went to Dallas, Texas, where his wife's family resided. During their sojourn there, Anastaplo took a course in oil-and-gas law. At the end of 1951 the family returned to Chicago, and Anastaplo began working at the Industrial Relations Center on the preparation of materials for a training course for management personnel. He remained at that job until August of 1957, and also taught an adult education course at the University College of the University of Chicago. More recently he has been devoting half time to teaching at the College, and half time to an administrative post there, and is working toward his Doctor of Philosophy degree on a phase of constitutional law.

Other activities since the original character hearing in 1951 include a 6-week management study of the Socony Mobil Oil Company, in New York in the summer of 1956, pursuant to a business fellowship from the Foundation for Economic Education; and serving as an election judge at the behest of both of the major political parties, in different elections. In this connection, it may be noted that the critical question of some committee members respecting this activity, when Anastaplo refused to identify his party affiliations on constitutional grounds, prompted him to inquire of the county judge whether he had unwittingly breached any rules by serving the Republican and Democratic parties at different elections, and whether something more than *pro forma* identification with a political party might be necessary to serve as an election judge. He also offered to return any payment received for his services. There was, however, no breach of any rules, nor any repayment of earnings necessary.

In the light of all the foregoing evidence appearing in the current record of over 400 pages, compiled pursuant to a searching examination of applicant by the committee during some six sessions of several hours each and extended from February to May of 1958, it is not clear to me just

how the majority of the committee or the *per curiam* opinion could conclude that applicant's refusal to reply to the questions on political affiliations prevented the committee from determining his character and fitness. I find apposite the statement in the minority report of the committee: "* * * On this record, it is pure sophistry to hold that his refusals to answer have prevented our determining his character."

I also fail to perceive the necessity for the delay of an entire year between the conclusion of the hearing and the decision of the committee. Although the majority report denied applicant admission to the bar essentially because they claimed his failure to reply to questions on membership in the Communist Party or other subversive groups prevented inquiry into subjects which bear on the issue of character, it is significant that the majority made favorable findings on all matters designed for inquiry in our rehearing order. They found that applicant's views on the right to revolution were not objectionable; nor was there anything objectionable in his activities since the original petition was denied, or with respect to his present reputation. The report stated:

"Since applicant's original application was denied, he has engaged principally in the academic life as an instructor and research assistant at the University of Chicago. * * * From the character affidavits and reference letters which have been submitted to us, it would appear that the applicant is well regarded by his academic associates, by professors who have taught him in school and by members of the Bar who know him personally. We have not been supplied with any information by any third party which is derogatory to Anastaplo's character or general reputation. We have received no information from any outside source which would cast any doubt on applicant's loyalty or which would tend to connect him in any manner with any subversive group."

Under these circumstances, I find more cogent the rationale of the minority report that since there were no adverse findings on the questions specified for rehearing,

and no derogatory information, applicant should not have been denied admission to the bar. I find entirely reasonable the minority's argument that applicant's refusal to answer certain questions was merely one factor which must be weighed along with the reasons for such refusal, and with other evidence; and that refusal to answer questions on grounds of devotion to constitutional principle does not "reflect adversely on character" and is a strange basis for denying admission to the bar.

With reference to the legal questions, I cannot agree with the statement in the *per curiam* opinion that the relevancy and constitutionality of the political-affiliations questions of bar applicants is no longer debatable. That issue has certainly not been determined in any bar admission case. It was expressly left undetermined in the *Konigsberg case*. In fact the court there recognized, as Anastaplo has consistently argued, that there was authority for regarding such questions as unconstitutional. The court stated at p. 270: "Prior decisions by this Court indicate that his [Konigsberg's] claim that the questions were improper was not frivolous, (*West Virginia Board of Education* v. *Barnette*, 319 U.S. 624, 87 L. ed. 1628,) and we find nothing in the record which indicates that his position was not taken in good faith."

The *Barnette case*, cited by the court, contained the following celebrated passage at p. 642: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion, *or force citizens to confess by word or action their faith therein.*" [Ital. supplied.]

While this passage, which has not been overruled, lends support to applicant's position that a Character and Fitness Committee, acting for the State Supreme Court would have no right in insist that an applicant reveal his faith in any political credo, that case itself is not decisive. Nor can I agree with the *per curiam* opinion that the recent *Barenblatt*

*case* (*Barenblatt* v. *United States,* 360 U.S. 109, 3 L. ed. 2d 1115, 79 S. Ct. 1081 (1959) is determinative of that issue, or is in any way factually analogous.

The *Barenblatt case* involved a contempt proceeding in which the petitioner refused to answer questions of the House Un-American Activities Committee relating to his affiliations with the Communist Party on the ground that they were barred by the first amendment. The majority opinion, to which four justices dissented, first explained that where first amendment rights are asserted to bar governmental interrogation, resolution of the issue always involves a balancing by the courts of the private and public interests at stake in the particular circumstances. After reaffirming the principle of the *Sweezy case* (*Sweezy* v. *New Hampshire,* 354 U.S. 234, 265, 1 L. ed. 2d 1311,) that "the subordinating interest of the State must be compelling," in order to overcome the individual rights, the Supreme Court held that the balance must be struck in favor of the governmental interests, since the pertinency of the questions was not open to doubt, and the government's right of self-preservation justified extending its investigatory power in the domain of communist infiltration in education.

Even the broadest interpretation of the *Barenblatt case,* however, would not sanction the type of inquiry made by the committee herein. The court based its decision, in a great measure, on the fact that the inquiry in that case was identified at the outset as an investigation of Communist infiltration in education, and that the individual examined had just previously been identified as a member of an alleged Communist group, and was being asked about that membership.

Such circumstances are a far cry from the situation in the case at bar. It is one thing to sustain the constitutionality of subversive affiliations questions when they are propounded to one identified as a Communist, and submitted

by an UnAmerican Activities Committee of the United States Congress, charged with discovering communist infiltration. It is quite another thing, however, to sanction such questions when asked of one against whom there is not a scintilla of evidence of subversive affiliations, and when the questions are submitted by a bar admission committee, charged only with ascertaining applicant's moral character, and in no way authorized by statute or rule of court to investigate or reject members of any political persuasion from the profession.

In my judgment, furthermore, the fact that the court in the *Barenblatt case* so closely circumscribed its decision, limiting it to the precise circumstances before it, stressing the pertinency of the questions, and calling attention to cases where the individual interests were held paramount, does not indicate a disposition to sustain the constitutionality of such questions in all types of cases.

However, this issue is not decisive in the Anastaplo case. As hereinbefore noted, the fundamental issue is not the constitutionality of the political-affiliations questions, but rather whether applicant's refusal to answer them could be deemed grounds for denial of admission to the bar for failure to establish good moral character. Therefore, I do not deem it necessary to try to resolve the constitutionality of the questions by analogy to the host of other related cases. (*N.A.A.C.P.* v. *Alabama,* 357 U.S. 448, 2 L. ed 2d 1488; *American Communications Ass'n* v. *Douds,* 339 U.S. 382, 94 L. ed. 925; *Slochower* v. *Board of Higher Education,* 350 U.S. 551, 100 L. ed. 692; *Kent* v. *Dulles,* 357 U.S. 116, 2 L. ed. 2d 1204; *Sweezy* v. *New Hampshire,* 354 U.S. 234, 1 L. ed. 2d 1311.) Even if this court were to conclude that the subversive affiliations questions under the circumstances did not offend the first and fourteenth amendments of the Federal constitution, and that George Anastasplo had no constitutional right to refuse to answer the committee's question, his refusal would constitute merely

one item of evidence, and we would still be obliged, under the decisions of the United States Supreme Court, to determine his moral character on the basis of the entire record. *Konigsberg* v. *State Bar of California,* 353 U.S. 252; *Schware* v. *Board of Bar Examiners,* 353 U.S. 232.

In evaluating that record, furthermore, this court may not draw any unfavorable inferences of character from an applicant's refusal to answer questions based upon a good faith reliance on constitutional principles. *Konigsberg* v. *State Bar of California,* 353 U.S. 252, 1 L. ed. 2d 810.

Inasmuch as I am firmly convinced that the law set forth by the United States Supreme Court in the *Konigsberg case* is determinative of the issue in the instant case, I am obliged to closely examine that decision and the ineffective ways in which the *per curiam* opinion has endeavored to whittle it away and to avoid it as a precedent.

In the *Konigsberg case a* bar applicant who had been identified as a Communist, and had been highly critical of government policies in his writings, was interrogated about his political affiliations and beliefs by the Bar Admission Committee in order to discover whether he was, or had ever been a member of the Community Party. As in the instant case, the applicant refused to respond to such questions on the ground that they were an intrusion into areas protected by the Federal constitution. He also objected on the ground that California law did not require him to divulge his political associations or opinions in order to qualify for the bar, and that the questions about these matters were not relevant. The Committee denied his application for admission, essentially on the ground that he failed to demonstrate that he was a person of good moral character. The action of the Committee was affirmed by the State court, but was reversed by the United States Supreme Court.

That decision emphasized (1) that bar admission cannot be denied for failure to establish good moral character,

unless it appears from an examination of the entire record that a reasonable man could fairly find that there were doubts about applicant's honesty, fairness and respect for the rights of others, and for the laws of the State and the nation; (2) that much significance should be attached to the affidavits relating to applicant's character, and the absence of derogatory testimony; and (3) that in a bar admission case no unfavorable inferences on moral character may be drawn from refusal to answer questions on constitutional grounds.

The *per curiam* opinion, of course, makes no reference to the court's statement at p. 270 disposing of the precise issue involved herein: "Obviously the State could not draw unfavorable inferences as to his [applicant's] truthfulness, candor or his moral character in general if his refusal to answer [the political affiliations questions] was based upon a belief that the United States Constitution prohibited the type of inquiries which the Committee was making." Nor does the *per curiam* opinion take cognizance of the decisive statement of the court at p. 273: "Without some authentic reliable evidence of unlawful or immoral actions reflecting adversely upon him, it is difficult to comprehend why the State Bar Committee rejected a man of Konigsberg's background and character as morally unfit to practice law."

What "authentic reliable evidence of unlawful or immoral actions reflecting adversely upon him" did the committee have against George Anastaplo? His refusal to answer questions on grounds that they were improper under the first and fourteenth amendments of the constitution? That conduct, according to the United States Supreme Court, may not be deemed adverse character evidence. The record is absolutely devoid of any conceivable derogatory evidence. If the United States Supreme Court had difficulty comprehending why Konigsberg was rejected even though there was some evidence of prior Communist membership and certain inflammatory writings, it would, *a for-*

*tiori,* have greater difficulty understanding why Anastaplo was denied admission to the bar where even the committee chairman admitted that there was no evidence whatever that the applicant was in any way ever connected with the Communist Party or with any subversive group.

The *per curiam* opinion endeavors to avoid the impact of this *Konigsberg case* by suggesting that it was not a final determination, since the cause was remanded to the State Court. This is specious reasoning. Obviously the case had to be remanded to the State court, for it is not the province of the United States Supreme Court to admit persons to membership to the bar of any State, but rather to determine whether the actions and standards imposed by the State in bar admission cases infringed constitutional rights. This the Supreme Court unequivocally did in the *Konigsberg case,* and any subsequent action by the California court in that case cannot modify, or in any way detract from the principles of law promulgated by the Supreme Court in the decision. Its determination that constitutional rights (the due-process guarantee) are infringed when a State denies an applicant admission to the bar for failure to establish good moral character, merely because he refuses on constitutional grounds to answer political or subversive affiliations questions, is binding upon this court and cannot be construed away.

The *per curiam* opinion further attempts to avoid the *Konigsberg* precedent by construing it holds only that there was inadequate notice to the applicant that refusal to answer would warrant rejection. The opinion then asserts that since such a warning was given in the instant case the *Konigsberg* decision is distinguishable. This attempt at refinement of the decision is contrary to the facts. The applicant in the *Konigsberg case* was given the same notice as Anastaplo was given. He was informed that refusal to answer would have a bearing on the committee's determination, and that some committee members did not agree that

he had a constitutional right to refuse to answer. (Footnote p. 259.) Similarly, the committee herein warned Anastaplo at p. 37 of the record, that his "refusal to answer may be taken into account by the Committee in determining whether you have established your fitness to become a member of the bar." In neither case was the applicant advised that refusal to answer would *ipso facto* warrant a denial of admission, irrespective of any and all other evidence. On the contrary, the actions of the committee in the instant case in conducting 5 more lengthy hearings, in encouraging the applicant to submit his writings and any other evidence, and in stating that it was "interested in your reasons for not answering," are inconsistent with any warning that refusal to answer would automatically preclude Anastaplo's admission to the bar.

Moreover, even if such a warning had been given, it would have been, according to the *Konigsberg case,* beyond the power of the committee. The court in that case noted that the committee has no authority or power by statute, decision or rule of court to apply a "brand new exclusionary rule," or a "brand new sanction on analogy to the summary contempt cases," whereby refusal to answer a question would mean rejection. The court stated at p. 260-261 : "There is nothing in the California statutes, the California decisions or even in the Rules of the Bar which has been called to our attention, that suggests that failure to answer a Bar Examiner's inquiry is ipso facto a basis for excluding an applicant from the Bar, irrespective of how overwhelming is his showing of good character or loyalty or how flimsy are the suspicions of the Bar Examiners." Nor is there any such authority in Illinois for applying any such "brand new exclusionary rule."

Equally untenable is the attempt to sidestep the *Konigsberg case* by bandying about words and arguing that this court is not drawing unfavorable character inferences from applicant's refusal to answer the political affiliations ques-

tions, but that such refusal prevented inquiry into subjects which bear upon his character and resulted in his failure to establish good character. As stated in the minority report, this reasoning is "pure sophistry." Any realistic appraisal of this record indicates that from the searching examination of applicant, from his letters and writings on the responsibilities of a citizen and lawyer to our government, from the writings of statesmen and scholars whose views he embraced, from the affidavits elicited by the committee, and from the committe's own independent investigation, it should have known well George Anastaplo, his moral character and his views respecting our constitutional government. Moreover, through its power of subpoena, the committee could have supplemented that fund of knowledge if necessary.

Therefore, in my judgment the determinative principles of the *Konigsberg case* cannot be avoided by any of the techniques of construction advanced in the *per curiam* opinion. Nor is the law of that case in any way modified or affected by the *Beilan* and *Lerner cases* relied upon by the *per curiam* opinion. (*Beilan* v. *Board of Education,* 357 U.S. 399, 2 L. ed. 2d 1414; *Lerner* v. *Casey,* 357 U.S. 468, 2 L. ed. 2d 1423.) These cases both carefully distinguished the *Konigsberg case.* They involved public employees who were dismissed under the Pennsylvania School Code and the New York Security Risk Law, respectively, for refusing, on fifth amendment grounds, to answer questions about membership in the Communist Party.

For those cases to be determinative of the Anastaplo case, we must equate "refusal to answer" with failure to establish good moral character. This means that the remainder of the evidence in the record, including all of the other questions and affidavits of good moral character is immaterial. Under this interpretation, the committee should have concluded the hearing after the first unanswered question on religious affiliations at p. 18 of the record, or shortly

thereafter at p. 34, when the first political affiliations questions were unanswered, for nothing said thereafter would have any significance.

How can this interpretation be squared with the committee's statement at p. 37 of the record that it was interested in applicant's reasons for not answering, or with the 6 sessions it held, or with the 400-page record it encouraged? How can such a course be followed in the light of the determinations in the *Konigsberg case* at p. 264 that in bar admission cases moral character must be determined from the entire record, and that refusal to answer on constitutional grounds is an insufficient basis for a finding of failure to establish good moral character.

The construction advanced by the *per curiam* opinion, moreover, would be inconsistent with the purpose and function of a character and fitness committee. That body is not an Un-American Activities Committee charged with investigating Communists, with power to require—indirectly —noncommunist oaths on pain of denial of admission to the bar. Nor it is conducting a contempt proceeding with the denial of the right to practice law imposed as punishment for refusal to answer questions which the Committee regards as "proper." It is not inconceivable, furthermore, that refusal to answer might be more indicative of good character in some instances, than answering. We have only to recall the unconstitutional religious interrogation of applicant herein to appreciate that fact.

Furthermore, the *per curiam* opinion has apparently lost sight of the fact that the *Lerner* and *Beilan cases* did not involve bar admissions, but rather the duties of public employees to their employer—a category which has long been given special treatment in the law. (*Garner* v. *Board of Public Works*, 341 U.S. 716, 95 L. ed. 1317; *Adler* v. *Board of Education*, 242 U.S. 485, 96 L. ed. 517.) In fact, the *Lerner* and *Beilan cases* add very little to the law laid down in the *Garner* and *Adler cases*, which were decided long prior to the *Konigsberg case*, which did not even refer to

those cases or regard them as authoritative in bar admissions interrogations.

In relying upon the *Beilan* and *Lerner cases* the *per curiam* opinion has deliberately overlooked the striking differences in the operative facts of those cases and the case at bar. The *Beilan* and *Lerner cases* involved evidence of "suspect activities," and membership in the Communist Party, all of which is entirely lacking in the instant case. Moreover, refusal to answer the subversive affiliations questions in those cases was predicated upon the privilege against self-incrimination, whereas in the case at bar Anastaplo would refuse to answer even if the replies reflected favorably upon him. In fact, his refusal was not limited to questions about subversive groups, but extended to all political affiliations, including membership in the Republican and Democratic parties.

In my judgment these fundamental differences in the operative facts certainly affect the significance of the refusal to answer, and warrant treating such refusal differently in the *Lerner* and *Beilan cases* than in the case before us.

In reviewing the other authorities cited by the *per curiam* opinion, I note the conspicuous omission of any discussion of the leading bar admission case of *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 1 L. ed. 2d 796. In that case the United States Supreme Court in a unanimous decision held that unless the committee's finding of failure to establish good moral character is substantiated by evidence, a denial of admission to the bar on that ground violates the due-process clauses of the Federal and State constitutions.

The court held that irrespective of whether the practice of law is labelled a "right" or a "privilege" (which the *per curiam* opinion calls it), an applicant cannot be excluded from practice in a manner, or for reasons that contravene the due-process clause of the fourteenth amendment. At p. 239, the court emphasized that any qualifications im-

posed by the State must have a rational connection with the applicant's fitness or capacity to practice law. Not only must the State avoid arbitrary standards, but even in applying permissible standards, it cannot exclude an applicant when there is no basis for finding that he fails to meet these standards.

After a review of the relevant principles of law in bar admission proceedings, the court found that neither membership in the Communist Party during the year between 1932 and 1940, nor the use of aliases to secure jobs, nor arrests under the particular circumstances constituted adverse evidence of moral character. The court reasoned that even though the nature and purposes of the Communist Party of 1950, as viewed in the *Douds case* (*American Communications Ass'n, C.I.O.* v. *Douds,* 339 U.S. 382, 94 L. ed. 2d 925) may warrant classifying it differently from other political parties, that view did not constitute a "substitute for evidence" to show that the petitioner participated in any illegal activity or did anything morally reprehensible as a member of the party.

The court quoted with approval the concept that "Mere unorthodoxy (in the field of political and social ideas) does not as a matter of fair and logical inference negative good moral character." It then stressed the importance of the character affidavits and the absence of derogatory testimony, and concluded that since there was no evidence to justify the bar examiners' finding that petitioner had not shown "good moral character," the action of the board, refusing to permit petititoner to take the bar examination, deprived him of due process of law.

If actual membership for 7 years in the Communist Party did not *per se* justify a finding of failure to establish good moral character in the opinion of the United States Supreme Court in the *Schware case,* then I fail to perceive how mere disagreement over constitutional interpretation can be deemed such morally reprehensible conduct as would

support a finding of failure to establish good moral character, as the *per curiam* opinion has affirmed in the instant case.

Before concluding this dissenting opinion, I am constrained to note that it is hardly consistent with judicial objectivity for the *per curiam* opinion to have overlooked every item of positive evidence submitted in support of establishing applicant's good moral character. Guidance on the meaning of the phrase "good moral character" is found in Justice Frankfurter's concurring opinion in the *Schware case* where the learned Justice stated: "It is a fair characterization of the lawyer's responsibility in our society that he stand 'as a shield,' to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility that have, through the centuries, been compendiously described as 'moral character.' "

Anyone reading this record, whether or not he agrees with George Anastaplo's interpretation of his constitutional rights, cannot come away without being impressed by his adherence to truth and what he regards as basic principles of good citizenship. His refusal to answer certain questions is not in fear of the truth, but rather in defense of what he believes to be the truth—that a citizen, particularly a lawyer, has a duty to defend constitutional principles, "even at the risk of incurring official displeasure." His restrained and well mannered testimony and conduct at the hearing corroborate fully the glowing evaluations of his character and reputation in the affidavits submitted to the committee.

On the basis of this entire record, it is my opinion that there was substantial evidence of George Anastaplo's good moral character, which was in no way marred by a single item of evidence from which the committee could reasonably conclude that there were doubts about applicant's honesty,

fairness and respect for the rights of others or for the laws of the nation. Under these circumstances, the committee's action denying applicant admission to the Illinois bar on the basis of its finding that he failed to establish good moral character, constituted a denial of due process of law under the decisions of the United States Supreme Court, and should properly have been rejected by this court.

SCHAEFER and DAVIS, JJ., also dissenting:

As a result of the exhaustive hearings before the Committee, we now have far more information as to the moral quality, the legal capacity and the political views of this applicant than is ordinarily the case.

The report of the Committee makes it clear that apart from the problems that stem from the applicant's insistence upon what he regards as his constitutional right to refuse to answer questions relating to his political views, there is no basis for denying him admission to the bar. The record suggests nothing derogatory as to his character or his reputation. The affirmative showing of good character and reputation is entirely convincing. So far as the right of revolution and the use of force to overthrow the government are concerned, the applicant was unable to visualize, in the foreseeable future, any circumstances that might call for its exercise in this country. We agree with the Committee that these views, illustrated as they were by the revolt of Hitler's generals toward the close of World War II and the recent Hungarian revolt, were neither subversive nor foreign to American political philosophy.

But the applicant did refuse to answer questions as to membership in the Communist party or in subversive organizations. Those questions were not predicated upon any information that might have led the Committee to suspect such membership. Despite the fact that the application has been pending for many years, the Committee expressly states that it has "received no information from any out-

side source which would cast any doubt on applicant's loyalty or which would tend to connect him in any manner with any subversive group."

Our prior decision determined that questions concerning the applicant's membership in the Communist Party or in subversive organizations were relevant, and we must now determine the consequence to be attached to his refusal to answer them. It is possible to say that he has refused to answer relevant questions, that the burden of proof rests on him and that he must therefore be denied admission to the bar.

In our opinion, however, a more penetrating approach to the problem is necessary if we are to discharge our duty with fairness and justice. The applicant has refused to answer these questions because he believes that they violate his rights under the first and fourteenth amendments to the constitution of the United States. He has expressly disclaimed any reliance upon the privilege against self-incrimination. His views as to the constitutional propriety of the questions may be right or they may be wrong, but there seems to be no doubt as to their sincerity. Adherence to them has prevented his admission to the bar for many years. We do not see in this record any basis for a finding that the applicant's refusal to answer raises a doubt as to the sincerity with which he takes the oath to support the State and Federal constitutions.

We think that it is unnecessary and inappropriate to decide this matter as though it called for an exercise of the ultimate limits of State power with respect to admission to the legal profession. What is involved is no more than an appraisal of the applicant's moral character and his fitness to practice law. His views upon the right of revolution were fully expounded before the Committee. Those views are incompatible with membership in the Communist Party, or with anything resembling subversion. It is hard to understand the logic of a position that permits the

applicant to expound at length upon his views as to the right of revolution but prevents him from answering questions as to Communist party membership. But we can not say that what seems to us to be a logical inconsistency is a reflection upon his character.

It is true that the work of the Committee has been greatly increased by the applicant's refusal to answer directly. But that refusal appears to have been sincerely based upon constitutional grounds that can not be said to be entirely implausible. To refuse admission, therefore, would amount only to an assertion of power beyond that which is required in order to determine the question before the court.

In our opinion the record sufficiently demonstrates that the applicant possesses the requisite qualifications for admission to the bar.