# IN RE ANASTAPLO.

No. 58.   Argued December 14, 1960.—Decided April 24, 1961.

Petitioner argued the cause and filed a brief *pro se.*

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for the State of Illinois, respondent. With him on the brief were *William L. Guild,* Attorney General, and *Raymond S. Sarnow* and *A. Zola Groves,* Assistant Attorneys General.

Briefs of *amici curiae,* urging reversal, were filed by *Roscoe T. Steffen* for the American Civil Liberties Union and by *David Scribner, Leonard B. Boudin, Ben Margolis, William B. Murrish* and *Charles Stewart* for the National Lawyers Guild.

Mr. Justice Harlan delivered the opinion of the Court.

The questions presented by this case are similar to those involved in No. 28, *Konigsberg* v. *State Bar of California,* decided today, *ante,* p. 36.

In 1954 petitioner, George Anastaplo, an instructor and research assistant at the University of Chicago, having previously passed his Illinois bar examinations, was denied admission to the bar of that State by the Illinois Supreme Court.[1] The denial was based upon his refusal to answer

---

[1] The Illinois procedure for admission to the bar was thus summarized by the State Supreme Court (3 Ill. 2d, at 475–476, 121 N. E. 2d, at 829):

"In the exercise of its judicial power over the bar, and in discharge of its responsibility for the choice of personnel who will compose that bar, this court has adopted Rule 58, (Ill. Rev. Stat. 1951, chap. 110, par. 259.58,) which governs admissions and provides, among other things, that applicants shall be admitted to the practice of law by this court after satisfactory examination by the Board of Examiners and certification of approval by a Committee on Character and Fitness. Section IX of the rule provides for the creation of such committees and imposes upon them the duty to examine applicants who appear before them for moral character, general fitness to practice law and good citizenship. Still another condition precedent to admission to practice law in this State, imposed by the legislature, is the taking of an oath to support the constitution of

questions of the Committee on Character and Fitness as to whether he was a member of the Communist Party.[2] This Court, two Justices dissenting, refused review. 348 U. S. 946. In 1957, following this Court's decisions in the earlier *Konigsberg* case, 353 U. S. 252, and in *Schware* v. *Board of Bar Examiners of New Mexico*, 353 U. S. 232, Anastaplo sought to have the Character Committee rehear his application for certification. The Committee, by a divided vote, refused, but the State Supreme Court reversed and directed rehearing.[3]

---

the United States and the constitution of the State of Illinois. (Ill. Rev. Stat. 1951, chap. 13, par. 4.)"

[2] On that occasion the State Supreme Court said (3 Ill. 2d, at 480, 121 N. E. 2d, at 831):

"It is our opinion, therefore, that a member of the Communist Party may, because of such membership, be unable truthfully and in good conscience to take the oath required as a condition for admission to practice, and we hold that it is relevant to inquire of an applicant as to his membership in that party. A negative answer to the question, if accepted as true, would end the inquiry on the point. If the truthfulness of a negative answer were doubted, further questions and information to test the veracity of the applicant would be proper. If an affirmative answer were received, further inquiry into the applicant's innocence or knowledge as to the subversive nature of the organization would be relevant. Under any hypothesis, therefore, questions as to membership in the Communist Party or known subversive 'front' organizations were relevant to the inquiry into petitioner's fitness for admission to the bar. His refusal to answer has prevented the committee from inquiring fully into his general fitness and good citizenship and justifies their refusal to issue a certificate."

[3] In remanding the matter to the Character Committee, the Illinois Supreme Court stated (see 18 Ill. 2d, at 186, 163 N. E. 2d, at 431):

" 'The principal question presented by the petition for rehearing concerns the significance of the applicant's views as to the overthrow of government by force in the light of *Konigsberg* v. *State Bar of California*, 353 U. S. 252, and *Yates* v. *United States*, 1 L. ed. 2d 1356, 77 S. Ct. 1064. Additional questions presented concern the applicant's activities since his original application was denied, and his present reputation.

The ensuing lengthy proceedings before the Committee,[4] at which Anastaplo was the only witness, are perhaps best described as a wide-ranging exchange between the Committee and Anastaplo in which the Committee sought to explore Anastaplo's ability conscientiously to swear support of the Federal and State Constitutions, as required by the Illinois attorneys' oath, and Anastaplo undertook to expound and defend, on historical and ideological premises, his abstract belief in the "right of revolution," and to resist, on grounds of asserted constitutional right and scruple, Committee questions which he deemed improper.[5] The Committee already had before it uncontroverted evidence as to Anastaplo's "good moral character," in the form of written statements or affidavits

---

" 'We are of the opinion that the Committee should have allowed the petition for rehearing and heard evidence on these matters, and the Committee is requested to do so, and to report the evidence and its conclusions.' "

[4] The proceedings consumed six hearing days, and resulted in a transcript of over 400 pages.

[5] More particularly: petitioner was first asked routine questions about his personal history. He refused, on constitutional grounds, to answer whether he was affiliated with any church. He answered all questions about organizational relationships so long as he did not know that the organization was "political" in character. He refused, on grounds of protected free speech and association, to answer whether he was a member of the Communist Party or of any other group named in the Attorney General's list of "subversive" organizations, including the Ku Klux Klan and the Silver Shirts of America.

Much of the ensuing five sessions was devoted to discussion of Anastaplo's reasons for believing that inquiries into such matters were constitutionally privileged, and to an unjustifiable attempt, later expressly repudiated by the Committee, to delve into the consistency of petitioner's religious beliefs with an attorney's duty to take an oath of office.

A substantial part of the proceedings revolved around Anastaplo's views as to the right to revolt against tyrannical government, and the right to resist judicial decrees in exceptional circumstances.

furnished by persons of standing acquainted with him, and the record on rehearing contains nothing which could properly be considered as reflecting adversely upon his character or reputation or on the sincerity of the beliefs he espoused before the Committee.[6] Anastaplo persisted, however, in refusing to answer, among other inquiries,[7] the Committee's questions as to his possible membership in the Communist Party or in other allegedly related organizations.

Thereafter the Committee, by a vote of 11 to 6, again declined to certify Anastaplo because of his refusal to answer such questions, the majority stating in its report to the Illinois Supreme Court:

"his [Anastaplo's] failure to reply, in our view, (i) obstructs the lawful processes of the Committee, (ii) prevents inquiry into subjects which bear intimately upon the issue of character and fitness, such as loyalty to our basic institutions, belief in representative government and *bona fides* of the attorney's oath and (iii) results in his failure to meet the burden of establishing that he possesses the good moral character and fitness to practice law, which are conditions to the granting of a license to practice law.

"We draw no inference of disloyalty or subversion from applicant's continued refusal to answer questions concerning Communist or other subversive affiliations. We do, however, hold that there is a strong public interest in our being free to question applicants for admission to the bar on their adherence to our basic institutions and form of government

---

[6] Although the transcript of the prior Committee proceedings has not been made part of the record before us, it is evident that it contained nothing which affirmatively reflected unfavorably on petitioner's character or reputation.

[7] See note 5, *supra*.

and that such public interest in the character of its attorneys overrides an applicant's private interest in keeping such views to himself. By failing to respond to this higher public interest we hold that the applicant has obstructed the proper functions of the Committee. . . . We cannot certify the applicant as worthy of the trust and confidence of the public when we do not know that he is so worthy and when he has prevented us from finding out."

At the same time the full Committee acknowledged that Anastaplo

"is well regarded by his academic associates, by professors who had taught him in school and by members of the Bar who know him personally . . .";

that it had

"not been supplied with any information by any third party which is derogatory to Anastaplo's character or general reputation . . .";

and that it had

"received no information from any outside source which would cast any doubt on applicant's loyalty or which would tend to connect him in any manner with any subversive group."

Further, the majority found that Anastaplo's views

"with respect to the right to overthrow the government by force or violence, while strongly libertarian and expressed with an intensity and fervor not necessarily shared by all good citizens, are not inconsistent with those held by many patriotic Americans both at the present time and throughout the course of this country's history and do not in and of themselves reveal any adherence to subversive doctrines."

Upon review, the Illinois Supreme Court, over three dissents,[8] confirmed the Committee's report and refusal to certify Anastaplo, reaffirming in its *per curiam* opinion the court's

".  .  . earlier conclusion that a determination as to whether an applicant can in good conscience take the attorney's oath to support and defend the constitutions of the United States and the State of Illinois is impossible where he refuses to state whether he is a member of a group dedicated to the overthrow of the government of the United States by force and violence."  18 Ill. 2d 182, 200–201, 163 N. E. 2d 429, 439.

We granted certiorari, 362 U. S. 968, and set the matter for argument along with the *Konigsberg* case, *ante,* p. 36, and *Cohen* v. *Hurley, post,* p. 117.

Two of the basic issues in this litigation have been settled by our contemporary *Konigsberg* opinion.  We have there held it not constitutionally impermissible for a State legislatively, or through court-made regulation as here and in *Konigsberg,* to adopt a rule that an applicant will not be admitted to the practice of law if, and so long as, by refusing to answer material questions, he obstructs a bar examining committee in its proper functions of interrogating and cross-examining him upon his qualifications.  That such was a proper function of the Illinois Character Committee is incontestably established by the opinions of the State Supreme Court in this case.  3 Ill.

---

[8] Two dissenting opinions were filed.  Justice Bristow dissented on constitutional grounds.  18 Ill. 2d, at 201, 163 N. E. 2d, at 439. Justices Schaefer and Davis, joining in a single opinion, did not reach the constitutional questions.  18 Ill. 2d, at 224, 163 N. E. 2d, at 928.

2d, at 476, 121 N. E. 2d, at 829; 18 Ill. 2d, at 188, 163 N. E. 2d, at 432.[9]

We have also held in *Konigsberg* that the State's interest in enforcing such a rule as applied to refusals to answer questions about membership in the Communist Party outweighs any deterrent effect upon freedom of speech and association, and hence that such state action does not offend the Fourteenth Amendment.[10]  We think that in this respect no valid constitutional distinction can be based on the circumstance that in *Konigsberg* there was some, though weak, independent evidence that the applicant had once been connected with the Communist Party, while here there was no such evidence as to

---

[9] In its second opinion, the State Supreme Court stated (18 Ill. 2d, at 188, 163 N. E. 2d, at 432):
"The committee further advises us that it has conducted no independent investigation into Anastaplo's character, reputation or activities.  For the very practical reason that the committee has no personnel or other resources for any such investigation, the committee states that it has traditionally asserted the view that it cannot be expected to carry the burden of establishing, by independent investigation, whether an applicant possesses the requisite character and fitness for admission to the bar and that a duty devolves upon the applicant to establish that he possesses the necessary qualifications and that it is then the duty of the committee to test, by hearings and questioning of the applicant, the worth of the evidence which he proffers.  We agree, and have held that the discretion exercised by the Committee on Character and Fitness will not ordinarily be reviewed.  *In re Frank*, 293 Ill. 263."

[10] The fact that in *Konigsberg* the materiality of questions relating to Communist Party membership rested directly on the existence of a California statute disqualifying from membership in the bar those advocating forcible overthrow of government, whereas here materiality stemmed from their bearing upon the likelihood that a bar applicant would observe as a lawyer the orderly processes that lie at the roots of this country's legal and political systems, cf. *Barenblatt* v. *United States*, 360 U. S. 109, is of course a circumstance of no significance.

Anastaplo. Where, as with membership in the bar, the State may withhold a privilege available only to those possessing the requisite qualifications, it is of no constitutional significance whether the State's interrogation of an applicant on matters relevant to these qualifications—in this case Communist Party membership—is prompted by information which it already has about him from other sources, or arises merely from a good faith belief in the need for exploratory or testing questioning of the applicant. Were it otherwise, a bar examining committee such as this, having no resources of its own for independent investigation, might be placed in the untenable position of having to certify an applicant without assurance as to a significant aspect of his qualifications which the applicant himself is best circumstanced to supply. The Constitution does not so unreasonably fetter the States.[11]

Two issues, however, do arise upon this record which are not disposed of by *Konigsberg*. The first is whether Anastaplo was given adequate warning as to the consequences of his refusal to answer the Committee's questions relating to Communist Party membership. The second is whether his exclusion from the bar on this ground was, in the circumstances of this case, arbitrary or discriminatory.

## I.

The opinions below reflect full awareness on the part of the Character Committee and the Illinois Supreme Court of Anastaplo's constitutional right to be warned in advance of the consequences of his refusal to answer.[12]

---

[11] Cf. *Garner* v. *Los Angeles Board*, 341 U. S. 716; *American Communications Assn.* v. *Douds*, 339 U. S. 382.

[12] The Committee's majority report states:

"The Committee repeatedly warned the applicant that questions regarding Communist affiliation were viewed as important by the

Cf. *Konigsberg* v. *State Bar,* 353 U. S., at 261. On the part of Anastaplo, he stands in the unusual position of one who had already been clearly so warned as a result of his earlier exclusion from the bar for refusal to answer the very question which was again put to him on rehearing. See note 2, *supra.* Anastaplo nevertheless, contends in effect that he was lulled into a false sense of security by various occurrences at the Committee hearings: (1) several statements by Committee members indicating that all questions asked and refused an answer should not be considered as bearing the same level of importance in the eyes of the Committee; [13] and (2) a statement by one of the principal Committee members that Illinois had no "per se" rule of exclusion, that is that Anastaplo's refusal to answer would not *automatically* operate to exclude him from the bar.[14]

---

Committee members and that his failure to respond to them could adversely affect his application for admission to the bar."

The Illinois Supreme Court stated (18 Ill. 2d, at 196, 163 N. E. 2d, at 436):

". . . no problem exists as to inadequate notice of the consequences of a refusal to answer; the applicant was specifically notified both by the Illinois Supreme Court in its opinion in 3 Ill. 2d 471, and by the committee on rehearing that his continued refusal to answer might lead to the denial of his application."

[13] It was stated at one point in the Committee hearings: "It has been pointed out before to you, that the mere fact that a question is asked does not indicate that other people would have asked or approved that question, nor does it indicate that any particular weight will be attached to the answer or failure to answer the question; do you understand?" It should be observed, however, that this remark, as was also the case with an earlier similar remark, was made in the context of questions involving petitioner's religious beliefs. See note 5, *supra.*

[14] This aspect of Anastaplo's contention is based on the following episode relating to the Committee's Communist Party questions:

"Mr. Anastaplo: . . . I would like to find out exactly what this

These suggestions, whether taken separately or together, can only be viewed as insubstantial. The sum and substance of the matter is that throughout the renewed proceedings petitioner was fully aware that his application for admission had already once been rejected on the very ground about which he now professes to have been left in doubt, and that the Committee made manifest both that it continued to attach special importance to its Communist Party affiliation questions, and that adverse

---

entails. You are not suggesting that refusal to answer that question would *per se* block my admission to the bar?

"Commissioner Stephan: No, I am saying your refusal to answer that question as to whether you are a member of the Communist Party, could and might.

"Mr. Anastaplo: I see.

"Commissioner Stephan: To us, it is relevant to your character and fitness. If you should answer the question 'yes,' I am not at all sure that would end the inquiry. I think if you should answer it 'yes,' the committee should be entitled to probe further and find out what kind of Communist Party member the applicant might be, whether he is an active member, whether he is a dues-paying member, whether he is a policy-making member, whether he is an officer in a local group, or just what he is. So I would point out the seriousness of that issue to you at this time.

"Mr. Anastaplo: I assume that the committee does not care to state why this is a particularly serious issue with respect to me? I mean—I notice you say nothing about the Ku Klux Klan or the Silver Shirts of America, about which you have also asked with the same amount of emphasis up to this point, and which I have refused to answer for the same reasons. Would you care to indicate why you say this about this question and not about the other ones?

"Commissioner Stephan: I think there is an easy answer to that. This committee has not come into being—this committee cannot completely ignore the history of this proceeding.

"Commissioner ————: But the history includes that question, and that question has been before two of the high courts of the country.

"Commissioner Stephan: Whatever the relevance of other questions, we consider that one quite relevant."

consequences might well follow if Anastaplo persisted in refusing to answer them.

What follows will suffice to show that statements to the effect that the Committee as a whole did not necessarily approve or adopt every question asked by any of its members can hardly be taken as having left petitioner in doubt as to the central importance and general approval of questions about Communist Party membership. At an early stage of the proceedings Anastaplo was informed:

> "Now you have asked for a warning when we put a question to you that we think is a pivotal, important question in connection with your qualification. I must tell you that we consider that question, 'Are you a member of the Communist Party,' such a question; and that the refusal to answer it may have serious consequences to your application."

And at the last hearing one of the leading Committee members responded to Anastaplo's insistence on being told even more explicitly what refusals to answer would be of significance to the Committee, by pointing out that

> "The Supreme Court of Illinois has ruled that it is proper for us to ask you whether you are a member of the Communist Party. You have refused to answer the question." [15]

Further, petitioner's repeated objections throughout the hearings to the effect that there was no basis for the Committee's evident purpose to give much greater emphasis to questions about Communist Party membership than to other unanswered inquiries, dispel any doubt that

---

[15] The particular importance which the Committee attached to its Communist Party questions was still further brought home to Anastaplo by the fact that after this Court's decisions in *Beilan* v. *Board of Education,* 357 U. S. 399, and *Lerner* v. *Casey,* 357 U. S. 468, had come down, the Committee wrote Anastaplo specifically drawing his attention to them.

Anastaplo was quite aware that Communist-affiliation questions were to be treated differently from other questions he had refused to answer.

The other aspect of petitioner's claim on lack of adequate warning is equally untenable. It is true that the Committee told Anastaplo that his refusal to answer questions would not *ipso facto* result in his exclusion from the bar, but only that it "could and might." This, however, certainly did not give rise to constitutional infirmity. Even as to one charged with crime due process does not demand that he be warned as to what specific sanction will be applied to him if he violates the law. It is enough that he know what sanction "could and might" be visited on him. Anastaplo was entitled to no more. It is of course indubitable that by reason of the original rejection of his application, Anastaplo knew of Illinois' rule of exclusion for refusal to answer relevant questions—indeed the very questions involved here.[16]

Petitioner having been fairly warned that exclusion from admission to practice might follow from his refusal to answer, it must be found that this requirement of due process was duly met.

## II.

Petitioner's claim that the application of the State's exclusionary rule was arbitrary and discriminatory in the circumstances of this case must also be rejected. It is contended (1) that Anastaplo's refusal to answer these

---

[16] We find it difficult to understand how it can be seriously suggested, as it further is, that petitioner was put off guard by the fact that instead of standing on petitioner's mere refusal to answer such questions, the Committee proceeded to interrogate him widely. Not only are subsequent events generally irrelevant to an earlier warning, but a large part of the questioning which Anastaplo now complains led him astray was in fact devoted to exploring the bearing of these questions on his fitness for admission to the bar and his reasons for declining to answer them.

particular questions did not obstruct the Committee's investigation, because that body already had before it uncontroverted evidence establishing petitioner's good character and fitness for the practice of law; and (2) that the real reason why the State proceeded as it did was because of its disapproval of Anastaplo's constitutionally protected views on the right to resist tyrannical government. Neither contention can be accepted.

It is sufficient to say in answer to the first contention that even though the Committee already had before it substantial character evidence altogether favorable to Anastaplo, there is nothing in the Federal Constitution which required the Committee to draw the curtain upon its investigation at that point. It had the right to supplement that evidence and to test the applicant's own credibility by interrogating him. And to those ends the Committee could insist upon unprivileged answers to relevant questions, such as we have held in our today's *Konigsberg* opinion those relating to Communist affiliations were, even though as to them the Committee could not, as it did not, draw an unfavorable inference from refusal to answer. *Konigsberg* v. *State Bar of California, supra.*

As to the second contention, there is nothing in the record which would justify our holding that the State has invoked its exclusionary refusal-to-answer rule as a mask for its disapproval of petitioner's notions on the right to overthrow tyrannical government.[17] While the Committee's majority report does observe that there was "a serious question" whether Anastaplo's views on the right to resist judicial decrees would be compatible with his taking of the attorney's oath, and that "certain" members of the Committee thought that such views affirma-

[17] Both the Committee's report and the State Supreme Court's opinion make it apparent that this area of Anastaplo's views played no part in his exclusion from the bar. See pp. 86–88, *supra;* 18 Ill. 2d, at 188, 163 N. E. 2d, at 432.

tively demonstrated his disqualification for admission to
the bar,[18] it is perfectly clear that the Illinois Bar Com-
mittee and Supreme Court regarded petitioner's refusal
to cooperate in the Committee's examination of him as the
basic and only reason for a denial of certification.[19]

A different conclusion is not suggested by the circum-
stances that the Committee when it reheard Anastaplo
evinced its willingness to consider the effect of petitioner's
refusal to answer in light of what might transpire at the
hearings, and that it continued to explore petitioner's
views on resistance and overthrow long after it became
clear that he would refuse to answer Communist-affilia-
tion questions. These factors indicate no more than that
the Committee was attempting to exercise an informed
judgment as to whether the situation was an appropriate
one for waiver of the Committee's continuing require-
ment, earlier enforced after the first Anastaplo hearings,
that such questions must be answered. Finally, contrary
to the assumption on which some of the arguments on
behalf of Anastaplo seem to have proceeded, we do not
understand that Illinois' exclusionary requirement will
continue to operate to exclude Anastaplo from the bar
any longer than he continues in his refusal to answer. We

---

[18] This of course could hardly be so in the context of the illustra-
tions which Anastaplo gave of his views as to when a right to resist
might arise. These were: Nazi Germany; Hungary during the 1956
revolt against Russia; a hypothetical decree of this Court estab-
lishing "some dead pagan religion as the official religion of the
country . . ."; a capital sentence of Jesus Christ. Asked to give
a more realistic instance of when resistance would be proper, Ana-
staplo summarized: "I know of no decree, off hand, in the history
of American government, where such a single instance has occurred.
No—I grant that it is hard to find these instances. I think it is
important to insist that there might be such instances." Nothing
in the State Court's opinion remotely suggests its approbation of
these views of "certain" Committee members.

[19] *Supra*, pp. 86–88.

find nothing to suggest that he would not be admitted now if he decides to answer, assuming of course that no grounds justifying his exclusion from practice resulted. In short, petitioner holds the key to admission in his own hands.

We conclude with observing that our function here is solely one of constitutional adjudication, not to pass judgment on what has been done as if we were another state court of review, still less to express any view upon the wisdom of the State's action. With appropriate regard for the limited range of our authority we cannot say that the State's denial of Anastaplo's application for admission to its bar offends the Federal Constitution.[20] The judgment of the Illinois Supreme Court must therefore be

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN concur, dissenting.

The petitioner George Anastaplo has been denied the right to practice law in the State of Illinois for refusing to answer questions about his views and associations. I think this action by the State violated rights guaranteed to him by the First and Fourteenth Amendments. The reasons which lead me to this conclusion are largely the same as those expressed in my dissenting opinion in *Konigsberg* v. *State Bar of California,* the companion case decided today, *ante,* p. 56. But this case provides such a striking illustration of the destruction that can be inflicted upon individual liberty when this Court fails to

---

[20] Apart from anything else, there is of course no room under our Rules for the suggestion made in petitioner's brief that he be admitted to the Bar of this Court, "independently of the action Illinois might be induced to take." See Rule 5, Revised Rules of this Court.

enforce the First Amendment to the full extent of its express and unequivocal terms that I think it deserves separate treatment.

The controversy began in November 1950,[1] when Anastaplo, a student at the University of Chicago Law School, having two months previously successfully passed the Illinois Bar examination, appeared before the State's Committee on Character and Fitness for the usual interview preliminary to admission to the Bar. The personal history form required by state law had been filled out and filed with the Committee prior to his appearance and showed that Anastaplo was an unusually worthy applicant for admission. His early life had been spent in a small town in southern Illinois where his parents, who had immigrated to this country from Greece before his birth, still resided. After having received his precollege education in the public schools of his home town, he had discontinued his education, at the age of eighteen, and joined the Air Force during the middle of World War II— flying as a navigator in every major theater of the military operations of that war. Upon receiving an honorable discharge in 1947, he had come to Chicago and resumed his education, obtaining his undergraduate degree at the University of Chicago and entering immediately into the study of law at the University of Chicago Law School. His record throughout his life, both as a student and as a citizen, was unblemished.

The personal history form thus did not contain so much as one statement of *fact* about Anastaplo's past life or conduct that could have, in any way, cast doubt upon his fitness for admission to the Bar. It did, however, contain

---

[1] As the majority points out, the record in the first series of hearings, which culminated in a denial of certiorari by this Court (348 U. S. 946), is not a part of the record in this case but we take judicial notice of it. *National Fire Ins. Co.* v. *Thompson*, 281 U. S. 331, 336, and cases cited there.

a statement of *opinion* which, in the minds of some of the members of the Committee at least, did cast such doubt and in that way served to touch off this controversy. This was a statement made by Anastaplo in response to the command of the personal history form: "State what you consider to be the principles underlying (a) the Constitution of the United States." Anastaplo's response to that command was as follows:

> "One principle consists of the doctrine of the separation of powers; thus, among the Executive, Legislative, and Judiciary are distributed various functions and powers in a manner designed to provide for a balance of power, thereby intending to prevent totally unrestrained action by any one branch of government. Another basic principle (and the most important) is that such government is constituted so as to secure certain inalienable rights, those rights to Life, Liberty and the Pursuit of Happiness (and elements of these rights are explicitly set forth in such parts of the Constitution as the Bill of Rights.). *And, of course, whenever the particular government in power becomes destructive of these ends, it is the right of the people to alter or to abolish it and thereupon to establish a new government.* This is how I view the Constitution." (Emphasis supplied.)

When Anastaplo appeared before a two-man Subcommittee of the Committee on Character and Fitness, one of its members almost immediately engaged him in a discussion relating to the meaning of these italicized words which were substantially taken from that part of the Declaration of Independence set out below.[2] This dis-

---

[2] "We hold these truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty; and the Pursuit of Happiness—That to secure these Rights, Governments are instituted

cussion soon developed into an argument as Anastaplo stood by his statement and insisted that if a government gets bad enough, the people have a "right of revolution." It was at this juncture in the proceedings that the other member of the Subcommittee interrupted with the question: "Are you a member of any organization that is listed on the Attorney General's list, to your knowledge?" And this question was followed up a few moments later with the question: "Are you a member of the Communist Party?" [3] A colloquy then ensued

---

among Men, deriving their just Powers from the Consent of the Governed, that whenever any Form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its Foundation on such Principles, and organizing its Powers in such Form, as to them shall seem most likely to effect their Safety and Happiness."

[3] The following excerpt from the record of the first hearing indicates clearly the connection between Anastaplo's views on the "right of revolution" and the questions subsequently asked him about his "possible" political associations:

"Commissioner MITCHELL: When you say 'believe in revolution,' you don't limit that revolution to an overthrow of a particular political party or a political government by means of an election process or other political means?

"Mr. ANASTAPLO: I mean actual use of force.

"Commissioner MITCHELL: You mean to go as far as necessary?

"Mr. ANASTAPLO: As far as Washington did, for instance.

"Commissioner MITCHELL: So that would it be fair to say that you believe the end result would justify any means that were used?

"Mr. ANASTAPLO: No, the means proportionate to the particular end in sight.

"Commissioner MITCHELL: Well, is there any difference from your answer and my question?

"Mr. ANASTAPLO: Did you ask—

"Commissioner MITCHELL: I asked you whether you thought that you believe that if a change, or overthrow of the government were justified, that any means could be used to accomplish that end.

"Mr. ANASTAPLO: Now, let's say in this positive concrete situation—I am not quite sure what it means in abstract.

"Commissioner MITCHELL: I will ask you in detail. You believe

between Anastaplo and the two members of the Subcommittee as to the legitimacy of the questions being asked, Anastaplo insisting that these questions were not reasonably related to the Committee's functions and that they violated his rights under the Constitution, and the mem-

that assuming the government should be overthrown, in your opinion, that you and others of like mind would be justified in raising a company of men with military equipment and proceed to take over the government of the United States, of the State of Illinois?

"By shaking your head do you mean yes?

"Mr. ANASTAPLO: If you get to the point where overthrow is necessary, then overthrow is justified. It just means that you overthrow the government by force.

"Commissioner MITCHELL: And would that also include in your mind justification for putting a spy into the administrative department, one or another of the administrative departments of the United States or the government of the State of Illinois?

"Mr. ANASTAPLO: If you got to the point you think the government should be overthrown, I think that would be a legitimate means.

"Commissioner MITCHELL: There isn't any difference in your mind in the propriety of using a gun or using a spy?

"Mr. ANASTAPLO: I think spies have been used in quite honorable causes.

"Commissioner MITCHELL: Your answer is, you do think so?

"Mr. ANASTAPLO: Yes.

"Commissioner BAKER: Let me ask you a question. Are you aware of the fact that the Department of Justice has a list of what are described as subversive organizations?

"Mr. ANASTAPLO: Yes.

"Commissioner BAKER: Have you ever seen that list?

"Mr. ANASTAPLO: Yes.

"Commissioner BAKER: Are you a member of any organization that is listed on the Attorney General's list, to your knowledge? (No answer.) Just to keep you from having to work so hard mentally on it, what organizations—give me all the organizations you are affiliated with or are a member of. (No answer.) That oughtn't to be too hard.

"Mr. ANASTAPLO: Do you believe that is a legitimate question?

"Commissioner BAKER: Yes, I do. We are inquiring into not only your character, but your fitness, under Rule 58. We don't compel you to answer it. Are you a member of the Communist Party?"

bers of the Subcommittee insisting that the questions were entirely legitimate.

The Subcommittee then refused to certify Anastaplo for admission to the Bar but, instead, set a further hearing on the matter before the full Committee. That next hearing, as well as all of the hearings that followed, have been little more than repetitions of the first. The rift between Anastaplo and the Committee has grown ever wider with each successive hearing. Anastaplo has steadfastly refused to answer any questions put by the Committee which inquired into his political associations or religious beliefs. A majority of the members of the Committee, faced with this refusal, has grown more and more insistent that it has the right to force him to answer any question it sees fit to ask. The result has been a series of hearings in which questions have been put to Anastaplo with regard to his "possible" association with scores of organizations, including the Ku Klux Klan, the Silver Shirts (an allegedly Fascist organization), every organization on the so-called Attorney General's list, the Democratic Party, the Republican Party, and the Communist Party. At one point in the proceedings, at least two of the members of the Committee insisted that he tell the Committee whether he believes in a Supreme Being and one of these members stated that, as far as his vote was concerned, a man's "belief in the Deity . . . has a substantial bearing upon his fitness to practice law."

It is true, as the majority points out, that the Committee did not expressly rest its refusal to certify Anastaplo for admission to the Bar either upon his views on the "right of revolution," as that "right" is defined in the Declaration of Independence, or upon his refusal to disclose his beliefs with regard to the existence of God,[4]

_____
[4] As the majority points out, the Committee eventually did expressly disavow any right to insist upon an answer to this question. This came at the end of a long disagreement between Anastaplo and

or upon his refusals to disclose any of his political associations other than his "possible" association with the Communist Party. But it certainly cannot be denied that the other questions were asked and, since we should not presume that these members of the Committee did not want answers to their questions, it seems certain that Anastaplo's refusal to answer them must have had some influence upon the final outcome of the hearings. In any case, when the Committee did vote, 11–6, not to certify Anastaplo for admission, not one member who asked *any* question Anastaplo had refused to answer voted in his favor.

The reasons for Anastaplo's position have been stated by him time and again—first, to the Committee and, later, in the briefs and oral arguments he presented in his own behalf, both before this Court and before the Supreme Court of Illinois. From a legal standpoint, his position throughout has been that the First Amendment gave him a right not to disclose his political associations or his religious beliefs to the Committee. But his decision to refuse to disclose these associations and beliefs went much deeper than a bare reliance upon what he considered to be his legal rights. The record shows that his refusal to answer the Committee's question stemmed primarily from his belief that he had a duty, both to society and to the legal profession, not to submit to the demands of the Committee because he believed that the questions had been asked solely for the purpose of harassing him because he

certain members of the Committee with respect to the vitality of an old Illinois decision which indicated that a belief in God might be necessary in order to take an oath to testify. The Committee's abandonment of the point came only after Anastaplo produced a more recent Illinois case disapproving the earlier decision. It is interesting to note that neither of the Committee members who had expressed such a strong interest in knowing whether Anastaplo believes in God voted in favor of his certification.

had expressed agreement with the assertion of the right of revolution against an evil government set out in the Declaration of Independence. His position was perhaps best stated before the Committee in his closing remarks at the final session:

"It is time now to close. Differences between us remain. I leave to others the sometimes necessary but relatively easy task of praising Athens to Athenians. Besides, you should want no higher praise than what I have said about the contribution the bar can make to republican government. The bar deserves no higher praise until it makes that contribution. You should be grateful that I have not made a complete submission to you, even though I have cooperated as fully as good conscience permits. To the extent I have not submitted, to that extent have I contributed to the solution of one of the most pressing problems that you, as men devoted to character and fitness, must face. This is the problem of selecting the standards and methods the bar must employ if it is to help preserve and nourish that idealism, that vital interest in the problem of justice, that so often lies at the heart of the intelligent and sensitive law student's choice of career. This is an idealism which so many things about the bar, and even about bar admission practices, discourage and make unfashionable to defend or retain. The worthiest men live where the rewards of virtue are greatest.

"I leave with you men of Illinois the suggestion that you do yourselves and the bar the honor, as well as the service, of anticipating what I trust will be the judgment of our most thoughtful judges. I move therefore that you recommend to the Supreme Court of Illinois that I be admitted to the bar of this

State. And I suggest that this recommendation be made retroactive to November 10, 1950 when a young Air Force veteran first was so foolish as to continue to serve his country by daring to defend against a committee on character and fitness the teaching of the Declaration of Independence on the right of revolution."

The reasons for the Committee's position are also clear. Its job, throughout these proceedings, has been to determine whether Anastaplo is possessed of the necessary good moral character to justify his admission to the Bar of Illinois. In that regard, the Committee has been given the benefit of voluminous affidavits from men of standing in their professions and in the community that Anastaplo is possessed of an unusually fine character. Dr. Alexander Meiklejohn, Professor of Philosophy, Emeritus, at the University of Wisconsin, for example, described Anastaplo as "intellectually able, a hard, thorough student and moved by high devotion to the principles of freedom and justice." Professor Malcolm P. Sharp of the University of Chicago Law School stated: "No question has ever been raised about his honesty or his integrity, and his general conduct, characterized by friendliness, quiet independence, industry and courage, is reflected in his reputation." Professor Roscoe T. Steffen of the University of Chicago Law School said: "I know of no one who doubts his honesty and integrity." Yves R. Simon, Professor of Philosophy at the University of Chicago, said: "I consider Anastaplo as a young man of the most distinguished and lofty moral character. Everybody respects him and likes him." Angelo G. Geocaris, a practicing attorney in the City of Chicago, said of Anastaplo: "His personal code of ethics is unexcelled by any practicing attorney I have met in the state of Illinois." Robert J. Coughlan, Division Director of

a research project at the University of Chicago, said: "His honesty and integrity are, in my opinion, beyond question. I would highly recommend him without the slightest reservation for any position involving the highest or most sacred trust. The applicant is a rare man among us today: he has an inviolable sense of Honor in the great traditions of Greek culture and thought. If admitted to the American Bar, he could do nothing that would not reflect glory on that institution."

These affidavits and many more like them were presented to the Committee. Most of the statements came from men who knew Anastaplo intimately on the University of Chicago campus where Anastaplo has remained throughout the proceedings here involved, working as a research assistant and as a lecturer in Liberal Arts and studying for an advanced degree in History and Social Sciences. Even at the present time, he is still there preparing his doctoral dissertation which, understandably enough, is tentatively entitled "The Historical and Philosophical Background of the First Amendment of the Constitution of the United States."

The record also shows that the Committee supplemented the information it had obtained about Anastaplo from these affidavits by conducting informal independent investigations into his character and reputation. It sent agents to Anastaplo's home town in southern Illinois and they questioned the people who knew him there. Similar inquiries were made among those who knew him in Chicago. But these intensive investigations apparently [5] failed to produce so much as one man in Chicago or in the whole State of Illinois who could say or would say, directly, indirectly or even by hearsay, one thing deroga-

---

[5] The record shows that although Anastaplo repeatedly requested that the Committee allow him to see any reports that resulted from these independent investigations, the Committee, without denying that such reports existed, refused to produce them.

tory to the character, loyalty or reputation of George Anastaplo, and not one man could be found who would in any way link him with the Communist Party. This fact is particularly significant in view of the evidence in the record that the Committee had become acquainted with a person who apparently had been a member of a Communist Party cell on the University of Chicago campus and that this person was asked to and did identify for the Committee every member of the Party whom he knew.

In addition to the information it had obtained from the affidavits and from its independent investigations, the Committee had one more important source of information about Anastaplo's character. It had the opportunity to observe the manner in which he conducted himself during the many hours of hearings before it. That manner, as revealed by the record before us and undenied by any findings of the Committee to the contrary, left absolutely nothing to be desired. Faced with a barrage of sometimes highly provocative and totally irrelevant questions from men openly hostile to his position, Anastaplo invariably responded with all the dignity and restraint attributed to him in the affidavits of his friends. Moreover, it is not amiss to say that he conducted himself in precisely the same manner during the oral argument he presented before this Court.

Thus, it is against the background of a mountain of evidence so favorable to Anastaplo that the word "overwhelming" seems inadequate to describe it that the action of the Committee in refusing to certify Anastaplo as fit for admission to the Bar must be considered. The majority of the Committee rationalized its position on the ground that without answers to some of the questions it had asked, it could not conscientiously perform its duty of determining Anastaplo's character and fitness to be a lawyer. A minority of the Committee described

this explanation as "pure sophistry." And it is simply impossible to read this record without agreeing with the minority. For, it is difficult to see what possible relevancy answers to the questions could have had in the minds of these members of the Committee after they had received such completely overwhelming proof beyond a reasonable doubt of Anastaplo's good character and staunch patriotism. I can think of no sound reason for further insistence upon these answers other than the very questionable, but very human, feeling that this young man should not be permitted to resist the Committee's demands without being compelled to suffer for it in some way.

It is intimated that the Committee's feeling of resentment might be assuaged and that Anastaplo might even be admitted to the Bar if he would only give in to the demands of the Committee and add the requested test oath to the already overwhelming proof he has submitted to establish his good character and patriotism. In this connection, the Court says: "We find nothing to suggest that he would not be admitted now if he decides to answer, assuming of course that no grounds justifying his exclusion from practice resulted. In short, petitioner holds the key to admission in his own hands." However well this familiar phrase may fit other cases, it does not fit this one. For the attitude of the Committee, as revealed by the transcript of its hearings, does not support a belief that Anastaplo can gain admission to the Illinois Bar merely by answering the Committee's questions, whatever answers he should give. Indeed, the Committee's own majority report discloses that Anastaplo's belief in the "right of revolution" was regarded as raising "a serious question" in the minds of a majority of the Committee with regard to his fitness to practice law and that "certain" members of that majority (how many, we cannot know) have already stated categorically that they will

not vote to admit an applicant who expresses such views. Nor does the opinion of the Illinois Supreme Court indicate that Anastaplo "holds the key to admission in his own hands." Quite the contrary, that court's opinion evidences an almost insuperable reluctance to upset the findings of the Committee. Certainly, that opinion contains nothing that even vaguely resembles the sort of implicit promise that would justify the belief asserted by the majority here. And, finally, I see nothing in the majority opinion of this Court, nor in the majority opinions in the companion cases decided today, that would justify a belief that this Court would unlock the door that blocks his admission to the Illinois Bar if Anastaplo produced the "key" and the state authorities refused to use it.

The opinion of the majority already recognizes that there is not one scrap of evidence in the record before us "which could properly be considered as reflecting adversely upon his [Anastaplo's] character or reputation or on the sincerity of the beliefs he espoused before the Committee," and that the Committee had not received any " 'information from any outside source which would cast any doubt on applicant's loyalty or which would tend to connect him in any manner with any subversive group.' " The majority opinion even concedes that Anastaplo was correct in urging that the questions asked by the Committee impinged upon the freedoms of speech and association guaranteed by the First and Fourteenth Amendments. But, the opinion then goes on to hold that Anastaplo can nonetheless be excluded from the Bar pursuant to "the State's interest in having lawyers who are devoted to the law in its broadest sense . . . ." [6] I cannot regard that holding, as applied to a man like Anastaplo, as in any way justi-

---

[6] *Konigsberg* v. *State Bar of California,* decided today, *ante,* pp. 36, 52, which the majority here relies upon as also having settled the issue in this case.

fied.  Consider it, for example, in the context of the following remarks of Anastaplo to the Committee— remarks the sincerity of which the majority does not deny:

> "I speak of a need to remind the bar of its traditions and to keep alive the spirit of dignified but determined advocacy and opposition.  This is not only for the good of the bar, of course, but also because of what the bar means to American republican government.  The bar when it exercises self-control is in a peculiar position to mediate between popular passions and informed and principled men, thereby upholding republican government.  Unless there is this mediation, intelligent and responsible government is unlikely.  The bar, furthermore, is in a peculiar position to apply to our daily lives the constitutional principles which nourish for this country its inner life.  Unless there is this nourishment, a just and humane people is impossible.  The bar is, in short, in a position to train and lead by precept and example the American people." [7]

These are not the words of a man who lacks devotion to "the law in its broadest sense."

The majority, apparently considering this fact irrelevant because the State might *possibly* have an interest in learning more about its Bar applicants, decides that Anastaplo can properly be denied admission to the Bar by purporting to "balance" the interest of the State of Illinois in "having lawyers who are devoted to the law in its broadest sense" against the interest of Anastaplo

---

[7] These remarks were made by Anastaplo in his closing argument before the Committee.  He also introduced evidence to the Committee that he had earlier expressed similar views in a book review published in 1954.  See Anastaplo, Review: Drinker, Legal Ethics, 14 Law. Guild Rev. 144.

and the public in protecting the freedoms of the First Amendment, concluding, as it usually does when it engages in this process, that "on balance" the interest of Illinois must prevail.[8] If I had ever doubted that the "balancing test" comes close to being a doctrine of governmental absolutism—that to "balance" an interest in individual liberty means almost inevitably to destroy that liberty—those doubts would have been dissipated by this case. For this so-called "balancing test"—which, as applied to the First Amendment, means that the freedoms of speech, press, assembly, religion and petition can be repressed whenever there is a sufficient governmental interest in doing so—here proves pitifully and pathetically inadequate to cope with an invasion of individual liberty so plainly unjustified that even the majority apparently feels compelled expressly to disclaim "any view upon the wisdom of the State's action."

I, of course, wholeheartedly agree with the statement of the majority that this Court should not, merely on the ground that such action is unwise, interfere with governmental action that is within the constitutional powers of that government. But I am no less certain that this Court should not permit governmental action that plainly abridges constitutionally protected rights of the People merely because a majority believes that on "balance" it is better, or "wiser," to abridge those rights than to leave them free. The inherent vice of the "balancing test" is that it purports to do just that. In the context of its reliance upon the "balancing test," the Court's disclaimer

---

[8] I think the majority has once again misapplied its own "balancing test," for the interests it purports to "balance" are no more at stake here than in *Konigsberg.* Moreover, it seems clear to me that Illinois, like California, is placing the burden of proof upon applicants for the Bar to prove they do not advocate the overthrow of the Government. Thus the decision here, like that in *Konigsberg,* is contrary to *Speiser* v. *Randall,* 357 U. S. 513.

of "any view upon the wisdom of the State's action" here thus seems to me to be wholly inconsistent with the only ground upon which it has decided this case.

Nor can the majority escape from this inconsistency on the ground that the "balancing test" deals only with the question of the importance of the existence of governmental power as a general matter without regard to the importance of its exercise in a particular case. For in *Barenblatt* v. *United States* the same majority made it clear that the "balancing test" is to be applied to the facts of each particular case: "Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake *in the particular circumstances shown.*" [9] (Emphasis supplied.) Thus the Court not only "balances" the respective values of two competing policies as a general matter, but also "balances" the wisdom of those policies in "the particular circumstances shown." Thus, the Court has reserved to itself the power to permit or deny abridgment of First Amendment freedoms according to its own view of whether repression or freedom is the wiser governmental policy under the circumstances of each case.

The effect of the Court's "balancing" here is that any State may now reject an applicant for admission to the Bar if he believes in the Declaration of Independence as strongly as Anastaplo and if he is willing to sacrifice his career and his means of livelihood in defense of the freedoms of the First Amendment. But the men who founded this country and wrote our Bill of Rights were strangers neither to a belief in the "right of revolution" nor to the urgency of the need to be free from the control of govern-

---

[9] 360 U. S. 109, 126. The majority in *Barenblatt* then proceeded to "balance" those interests on the basis of the particular record of that case. *Id.,* at 127–134.

ment with regard to political beliefs and associations. Thomas Jefferson was not disclaiming a belief in the "right of revolution" when he wrote the Declaration of Independence. And Patrick Henry was certainly not disclaiming such a belief when he declared in impassioned words that have come on down through the years: "Give me liberty or give me death." This country's freedom was won by men who, whether they believed in it or not, certainly practiced revolution in the Revolutionary War.

Since the beginning of history there have been governments that have engaged in practices against the people so bad, so cruel, so unjust and so destructive of the individual dignity of men and women that the "right of revolution" was all the people had left to free themselves. As simple illustrations, one government almost 2,000 years ago burned Christians upon fiery crosses and another government, during this very century, burned Jews in crematories. I venture the suggestion that there are countless multitudes in this country, and all over the world, who would join Anastaplo's belief in the right of the people to resist by force tyrannical governments like those.

In saying what I have, it is to be borne in mind that Anastaplo has not indicated, even remotely, a belief that this country is an oppressive one in which the "right of revolution" should be exercised.[10] Quite the contrary,

---

[10] Anastaplo's belief in the "right of revolution," as disclosed by this record, is no different from that expressed by Professor Chafee: "Most of us believe that our Constitution makes it possible to change all bad laws through political action. We ought to disagree vehemently with those who urge violent methods, and whenever necessary take energetic steps to prevent them from putting such methods into execution. This is a very different matter from holding that all discussion of the desirability of resorting to violence for political purposes should be ruthlessly stamped out. There is not one among us who would not join a revolution if the reason for it be made strong enough." Chafee, Free Speech in the United States 178 (Harvard University Press, 1942).

the entire course of his life, as disclosed by the record, has been one of devotion and service to his country—first, in his willingness to defend its security at the risk of his own life in time of war and, later, in his willingness to defend its freedoms at the risk of his professional career in time of peace. The one and only time in which he has come into conflict with the Government is when he refused to answer the questions put to him by the Committee about his beliefs and associations. And I think the record clearly shows that conflict resulted, not from any fear on Anastaplo's part to divulge his own political activities, but from a sincere, and in my judgment correct, conviction that the preservation of this country's freedom depends upon adherence to our Bill of Rights. The very most that can fairly be said against Anastaplo's position in this entire matter is that he took too much of the responsibility of preserving that freedom upon himself.

This case illustrates to me the serious consequences to the Bar itself of not affording the full protections of the First Amendment to its applicants for admission. For this record shows that Anastaplo has many of the qualities that are needed in the American Bar.[11] It shows, not only that Anastaplo has followed a high moral, ethical and patriotic course in all of the activities of his life, but also that he combines these more common virtues with the uncommon virtue of courage to stand by his principles at any cost. It is such men as these who have most greatly honored the profession of the law—men like Malsherbes, who, at the cost of his own life and the lives of his family, sprang unafraid to the defense of Louis XVI against the

---

[11] For a similar case, see *In re Summers*, 325 U. S. 561, in which a 5–4 majority of this Court upheld an informal order of the Illinois Supreme Court denying Bar admission to Clyde W. Summers on the ground that his religious beliefs were inconsistent with the Illinois Constitution.

fanatical leaders of the Revolutionary government of France [12]—men like Charles Evans Hughes, Sr., later Mr. Chief Justice Hughes, who stood up for the constitutional rights of socialists to be socialists and public officials despite the threats and clamorous protests of self-proclaimed superpatriots [13]—men like Charles Evans Hughes, Jr., and John W. Davis, who, while against everything for which the Communists stood, strongly advised the Congress in 1948 that it would be unconstitutional to pass the law then proposed to outlaw the Communist Party [14]—men like Lord Erskine, James Otis, Clarence Darrow, and the multitude of others who have dared to speak in defense of causes and clients without regard to personal danger to themselves. The legal profession will lose much of its nobility and its glory if it is not constantly replenished with lawyers like these. To force the Bar to become a

[12] At the time of his decision to volunteer his services in defense of Louis XVI, Malsherbes, a man of more than seventy, was apparently completely safe from the post-revolutionary blood bath which then enveloped France. For, although active in public life prior to the Revolution, he had always been a friend of the people and, in any case, he had largely passed out of the public mind with his retirement some years earlier. Within a year of his unsuccessful defense of the life of France's former king, however, he, together with his entire family, was convicted by a revolutionary tribunal on the vague charge of conspiracy against "the safety of the State and the unity of the Republic." Malsherbes was then taken to the guillotine where, after being forced to witness the beheading of the other members of his family, he paid with his life for his courage as a lawyer. This story has been interestingly told by John W. Davis. See Davis, The Lawyers of Louis XVI, in The Lawyer, April 1942, p. 5, at 6–13.

[13] The story of Hughes' participation in the fight against the action of the New York Legislature in suspending five of its members in 1920 on the ground that they were socialists is told in John Lord O'Brian, Loyalty Tests and Guilt by Association, 61 Harv. L. Rev. 592, 593–594.

[14] See *Barenblatt* v. *United States*, 360 U. S. 109, 147–148 (dissenting opinion).

group of thoroughly orthodox, time-serving, government-fearing individuals is to humiliate and degrade it.

But that is the present trend, not only in the legal profession but in almost every walk of life. Too many men are being driven to become government-fearing and time-serving because the Government is being permitted to strike out at those who are fearless enough to think as they please and say what they think.[15] This trend must be halted if we are to keep faith with the Founders of our Nation and pass on to future generations of Americans the great heritage of freedom which they sacrificed so much to leave to us. The choice is clear to me. If we are to pass on that great heritage of freedom, we must return to the original language of the Bill of Rights. We must not be afraid to be free.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE joins, dissenting.

I join MR. JUSTICE BLACK's dissent. I add only that I think the judgment must also be reversed on the authority of *Speiser* v. *Randall,* 357 U. S. 513, for the reasons expressed in my dissent in *Konigsberg* v. *State Bar of California, ante,* p. 80.

---

[15] See, *e. g., Barsky* v. *Board of Regents,* 347 U. S. 442; *Uphaus* v. *Wyman,* 360 U. S. 72; *Barenblatt* v. *United States,* 360 U. S. 109; *Uphaus* v. *Wyman,* 364 U. S. 388; *Wilkinson* v. *United States,* 365 U. S. 399; *Braden* v. *United States,* 365 U. S. 431; *Konigsberg* v. *State Bar of California, supra.*